[No. S102671. Aug. 4, 2003.]

SHARON S., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
ANNETTE F., Real Party in Interest.

418

---

COUNSEL

Douglas Shepersky, William Blatchley; John L. Dodd & Associates, John L. Dodd and Lisa A. DiGrazia for Petitioner.

Kronick, Moskovitz, Tiedemann & Girard and Andrew P. Pugno for Proposition 22 Legal Defense and Education Fund as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Terence Chucas and Judith E. Klein for Minor.

Leigh A. Kretzschmar, Kathleen Murphy Mallinger; Luce Forward, Hamilton & Scripps and Charles A. Bird for Real Party in Interest.

Robert H. Lynn; Jason A. Barsi; Maxie Rheinheimer Stephens & Vrevich and Darin L. Wessel for Tom Homann Law Association as Amicus Curiae on behalf of Real Party in Interest.

Martha Matthews and Katina Ancar for National Center for Youth Law as Amicus Curiae.

Alice Bussiere for Youth Law Center as Amicus Curiae.

Shannan Wilber for Legal Services for Children as Amicus Curiae.

Farella Braun & Martel, Norman Formanek and Julie Salamon for Child Advocacy Program, University of California at Berkeley as Amicus Curiae.

Donna Furth for Northern California Association of Counsel for Children as Amicus Curiae.

Marvin Ventrell for National Association of Counsel for Children as Amicus Curiae.

Jordan C. Budd for American Civil Liberties Union Foundation of San Diego & Imperial Counties; Mark Rosenbaum for American Civil Liberties Union Foundation of Southern California; Alan L. Schlosser for American Civil Liberties Union Foundation of Northern California; Jennifer C. Pizer for Lambda Legal Defense and Education Fund; Shannon Minter and Courtney Joslin for The National Center for Lesbian Rights as Amici Curiae on behalf of Children of Lesbians and Gays Everywhere, American Civil Liberties Union Foundation of San Diego & Imperial Counties, American Civil Liberties Union Foundation of Southern California, American Civil Liberties Union Foundation of Northern California, Bay Area Lawyers for Individual Freedom, Family Matters, Family Pride Coalition, Lambda Legal Defense and Education Fund, LHR: The Lesbian and Gay Bar Association, The Los Angeles Gay and Lesbian Center, The National Center for Lesbian Rights, Our Family Coalition and The Pop Luck Club.

Diane Goodman for Academy of California Adoption Lawyers as Amicus Curiae.

Nancy E. Lofdahl for California Association of Adoption Agencies and the California Alliance of Child and Family Services as Amici Curiae.

Morrison & Foerster, Michael N. Feuer and Elizabeth A. Thornton for the Los Angeles County Bar Association, Bar Association of San Francisco, Santa Clara County Bar Association, The Bar Association of Silicon Valley, Beverly Hills Bar Association, San Fernando Valley Bar Association, Women Lawyers' Association of Los Angeles, Bet Tzedek Legal Services, Public Counsel and Northern California Chapter of the American Academy of Matrimonial Lawyers as Amici Curiae.

Dennis J. Herrera, City Attorney (San Francisco), Therese M. Stewart, Chief Deputy City Attorney, Kamala Harris, Julia M. C. Friedlander, Ellen Forman and Sherri Sokeland Kaiser, Deputy City Attorneys, for City and County of San Francisco and California State Association of Counties as Amici Curiae.

Bill Lockyer, Attorney General, James M. Humes, Assistant Attorney General, John H. Sanders and Susan A. Nelson, Deputy Attorneys General, for California Department of Social Services as Amicus Curiae.

Latham & Watkins, Richard S. Zbur, Robert J. Schulze and James R. Repking for National Association of Social Workers and California Chapter, National Association of Social Workers as Amici Curiae.

## OPINION

**WERDEGAR, J.—** ■ This dispute arises in independent adoption proceedings commenced by a birth mother, Sharon S. (Sharon), and her former domestic partner Annette F. (Annette) to effect Annette's adoption of Joshua (now three and a half years old) who, like his older brother Zachary (now six years old and previously adopted by Annette), was conceived by artificial insemination of Sharon and born during the partnership.[1] The question presented is whether an independent adoption in which the birth parent does not agree to termination of her parental rights is legislatively authorized and, if so, whether the statutes are constitutional. The Court of Appeal granted a writ of mandamus directing the trial court to permit Sharon to withdraw her consent to, and to terminate, the adoption. For the following reasons, we reverse the judgment of the Court of Appeal and remand the cause for further proceedings.

### BACKGROUND

Sharon and Annette attended Harvard Business School together and were in a committed relationship from 1989 through mid–2000. In 1996, after being artificially inseminated with sperm from an anonymous donor, Sharon gave birth to Zachary. With Sharon's consent and approval, Annette petitioned to adopt Zachary in a "second parent" adoption, using official forms and procedures that expressly provided that Sharon consented to Zachary's adoption by Annette but intended to retain her own parental rights.[2] The trial court approved Annette's adoption petition, and Annette has since been one of Zachary's two parents.

Three years later, in 1999, Sharon was inseminated again with sperm from the same anonymous donor and gave birth to Joshua. On August 30 of that year, Sharon signed an "Independent Adoption Placement Agreement" (Agreement), which begins: "Note to birth parent: This form will become a permanent and irrevocable consent to adoption. Do not sign this form unless you want the adopting parents named below to adopt your child." The Agreement goes on to recite Sharon's "permanent and irrevocable consent to the adoption on the 91st day after I sign" the Agreement.

---

[1] Independent adoptions (Fam. Code, § 8800 et seq.) are those in which no agency, state or private, joins in the adoption petition (*id.*, § 8524), although the state does have a role in investigating, evaluating and commenting upon the petition. (See *id.*, § 8807.) Further unlabeled section references are to the Family Code.

[2] "The phrase 'second-parent adoption' refers to an independent adoption whereby a child born to [or legally adopted by] one partner is adopted by his or her non-biological or non-legal second parent, with the consent of the legal parent, and without changing the latter's rights and responsibilities." (Doskow, *The Second Parent Trap* (1999) 20 J. Juv. L. 1, 5.) As a result of the adoption, the child has two legal parents who have equal legal status in terms of their relationship with the child.

The Agreement also recites that, upon the court's approval of the Agreement, Sharon will "give up all rights of custody, services, and earnings" with respect to Joshua. However, a written "Addendum to Independent Adoption Placement Agreement" (Addendum), a form developed by the California Department of Social Services (CDSS), was signed by Sharon and Annette on the same date as they signed the Agreement. The Addendum stated Sharon's intent, as Joshua's birth parent, to retain parental rights and control of Joshua while placing him with Annette for the purpose of independent adoption. These were essentially the same procedures and forms Sharon and Annette had used for Zachary's adoption.[3]

Subsequently, Annette filed a petition to adopt Joshua as a second parent with Sharon. The petition stated that Sharon, as "birth mother of the children [Zachary and Joshua,] consents to this adoption and will execute a limited written consent to the child's [Joshua's] adoption in the manner required by law." The petition also stated that Sharon "intends to retain all her rights to custody and control as to said child." In April 2000, the San Diego County Department of Health and Human Services (HHS), acting in its capacity as an agency licensed by CDSS under the Family Code to investigate and report upon proposed independent adoptions, recommended that the court grant Annette's adoption petition.

Annette and Sharon's relationship has been somewhat volatile. Apparently owing to continuing difficulties, Sharon repeatedly requested postponement of the hearing on Annette's adoption petition. In August 2000, Sharon asked Annette to move out of the family residence, which Annette did. Each retained new counsel. In mediation, the parties agreed on a temporary visitation schedule affording Annette time with both boys, but they could not reach an agreement respecting permanent custody or visitation.

On October 23, 2000, Annette filed a motion for an order of adoption respecting Joshua, contending, inter alia, that Sharon's consent had become irrevocable pursuant to section 8814.5 and that the adoption was in Joshua's best interest.

After a family court mediator recommended that Sharon and Annette share custody and that Annette have specified visitation, Sharon moved for court approval to withdraw her consent to the adoption. She contended there was no legal basis for the adoption, that her consent had been obtained by fraud or duress, and that withdrawal of her consent was in Joshua's best interest. HHS

---

[3]CDSS forms and procedures for second parent adoptions have been developed over the past decade and presently are maintained in accordance with a policy announced by CDSS on November 15, 1999. (See CDSS, All County Letter No. 99-100 (Nov. 15, 1999) <http://www.dss.cahwnet.gov/getinfo/acl99/99-100.pdf> [as of Aug. 4, 2003].)

subsequently filed a supplemental report with the court, noting that Sharon had moved to withdraw her consent but had not done so within the statutorily specified period for revocation. HHS further reported that Annette had shared in Joshua's medical expenses and in the planning and handling of his daily care since birth, that Annette had a close and loving relationship with Joshua as his second parent, and that Annette's relationship with Joshua was similar to her relationship with Zachary. Finding that adoption continued to be in Joshua's best interest, HHS again recommended that Annette's petition to adopt Joshua be granted.

In late November 2000, the court ordered interim visitation, encouraged the parties to try to agree on an ongoing visitation schedule, and appointed counsel for Joshua.[4] Shortly thereafter, Sharon obtained a domestic violence restraining order against Annette and moved to dismiss the adoption petition. She argued, again, that the adoption was unauthorized by statute and also that Annette lacked standing to adopt Joshua. Joshua's counsel also moved to dismiss the adoption petition, on the ground that Sharon and Annette's original counsel had not complied with her statutory obligations as an attorney representing both the birth and prospective adoptive parents in an independent adoption. (See § 8800.) The court denied both dismissal motions. Although it did not separately discuss Sharon's request for permission to withdraw consent, the court noted that Sharon had not attempted to withdraw her consent within the time required by law and that resolution of the adoption petition was likely to be based on Joshua's best interest.

Thereupon, Sharon filed a petition for a writ of mandate, joined in by counsel for Joshua, challenging the denial of her motion to dismiss. In a divided opinion, the court, citing section 8617, held that, except for stepparent adoptions, an adoption where a consenting parent does not relinquish all parental rights has no statutory basis. We granted Annette's petition for review.

## DISCUSSION

### I. *Section 8617*

"The right to adopt a child, and the right of a person to be adopted as the child of another, are wholly statutory." (*Estate of Sharon* (1918) 179 Cal. 447, 454 [177 P. 283].) California's adoption statutes appear in division 13 of the Family Code, which is divided into three parts. Part 1 (§§ 8500–8548) provides definitions applicable throughout. Part 2 (§§ 8600–9206) addresses

---

[4] As Joshua's appellate counsel noted during oral argument, the function of a court-appointed attorney for the child in such proceedings as these is to represent the child's interests. (See § 3150.)

adoption of unmarried minors, and part 3 (§§ 9300–9340) adoption of adults and married minors. The part with which we are concerned, part 2, is in turn divided into several chapters. Chapter 1 (§ 8600 et seq.) contains general provisions. Subsequent chapters deal with agency adoptions (§ 8700 et seq.), independent adoptions (§ 8800 et seq.), intercountry adoptions (§ 8900 et seq.), and stepparent adoptions (§ 9000 et seq.).

As noted, in petitioning to adopt Joshua, Annette has proceeded under the independent adoption provisions. ■ Pursuant to the current statutory scheme, birth parents can consent to an independent adoption by entering into an adoption placement agreement with a prospective adoptive parent. (Fam. Code, § 8801.3; see also Cal. Code Regs., tit. 22, § 35108, subd. (b).) The birth parents have 30 days in which to revoke this consent. (Fam. Code, § 8814.5, subd. (a)(1).)[5] If they fail to do so, their consent becomes permanent and irrevocable. (§§ 8801.3, subd. (c)(2), 8814.5, subds. (a)(1), (3), (b), 8815, subd. (a).)

Once the adoption placement agreement has been signed, the prospective adoptive parent may petition for adoption. (§ 8802, subd. (a)(1)(C).) The court clerk must give CDSS notice of the petition (*id.*, subd. (a)(2)), and the petitioner must file a copy of the petition with CDSS (§ 8808).

Subsequently, it is incumbent on CDSS to "investigate the proposed independent adoption" (§ 8807, subd. (a)) and "ascertain whether the child is a proper subject for adoption and whether the proposed home is suitable for the child." (Fam. Code, § 8806; see also Cal. Code Regs., tit. 22, §§ 35079, subd. (b), 35081, 35083, 35087, 35089, 35093.) CDSS interviews the petitioner and the birth parents. (Fam. Code, § 8808; see also Cal. Code Regs., tit. 22, § 35083.) Within 180 days after the petition is filed, CDSS must "submit to the court a full report of the facts disclosed by its inquiry with a recommendation regarding the granting of the petition. " (Fam. Code, § 8807, subd. (a); see also Cal. Code Regs., tit. 22, §§ 35091, 35123, subd. (a).) A copy of CDSS's report is given to the petitioner. (Fam. Code, § 8821.) Although the report is not binding, the court is to accord due weight to CDSS's expertise. (*San Diego County Dept. of Pub. Welfare v. Superior Court* (1972) 7 Cal.3d 1, 16 [101 Cal.Rptr. 541, 496 P.2d 453].) Assuming other statutory prerequisites are met, if the court is "satisfied that the interest of the child will be promoted by the adoption, the court may make and enter an order of adoption of the child by the prospective adoptive parent or parents." (§ 8612, subd. (c).)

---

[5] In 1999, when Annette petitioned to adopt Joshua, section 8814.5 provided that a birth parent consenting to an adoption had 90 days to revoke consent or sign a waiver of the revocation right. Since then, section 8814.5 has been amended to shorten the revocation period to 30 days. (See Stats. 2001, ch. 688, § 2.)

Annette argues that these statutes authorize the superior court to finalize her adoption of Joshua, because she has complied with the substantive and procedural prerequisites for an independent adoption. Sharon contends that the adoption is not authorized, because section 8617 mandates full termination of birth parental rights in every independent adoption.

Section 8617 provides: "The birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child." The section does not appear in the chapter devoted to independent adoptions (ch. 3, § 8800 et seq.), but is, rather, one of the general provisions appearing in chapter 1 of part 2 of division 13 of the Family Code.

"The rule is that the adoption statutes are to be liberally construed with a view to effect their objects and to promote justice. Such a construction should be given as will sustain, rather than defeat, the object they have in view." (*Department of Social Welfare v. Superior Court* (1969) 1 Cal.3d 1, 6 [81 Cal.Rptr. 345, 459 P.2d 897]; see also *Adoption of Barnett* (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18]; *Adoption of McDonald* (1954) 43 Cal.2d 447, 459 [274 P.2d 860]; *In re Santos* (1921) 185 Cal. 127, 130 [195 P. 1055].) Consistently with these principles, we previously have concluded that the Legislature did not intend section 8617's nearly identical precursor to bar an adoption when the parties clearly intended to waive the operation of that statute and agreed to preserve the birth parent's rights and responsibilities. (*Marshall v. Marshall* (1925) 196 Cal. 761, 767 [239 P. 36].) Nothing in section 8617's text, context, history, or function justifies departure in this case from "the established rule that rights conferred by statute may be waived unless specific statutory provisions prohibit waiver." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1049, fn. 4 [68 Cal.Rptr.2d 758, 946 P.2d 427].)

## A. *Waiver of Statutory Rights*

In *Bickel v. City of Piedmont, supra,* 16 Cal.4th 1040 (*Bickel*), we held that a party benefited by a statutory provision may waive that benefit if the statute does not prohibit waiver (*id.* at p. 1049, fn. 4), the statute's "public benefit . . . is merely incidental to [its] primary purpose" (*id.* at p. 1049), and "waiver does not seriously compromise any public purpose that [the statute was] intended to serve" (*id.* at p. 1050). (See also Civ. Code, § 3513 [anyone "may waive the advantage of a law intended solely for his benefit"].) The principles underlying *Bickel* are well established. As we have recognized for over a century, the law "will not compel a man to insist upon any benefit or advantage secured to him individually." (*Knarston v. Manhattan Life Ins. Co.* (1903) 140 Cal. 57, 63 [73 P. 740].) ▮ Accordingly, a party may waive

compliance with statutory conditions intended for his or her benefit, so long as the Legislature has not made those conditions mandatory. (*Murdock v. Brooks* (1869) 38 Cal. 596, 602; see also *Wells, Fargo & Co. v. Enright* (1900) 127 Cal. 669, 674 [60 P. 439].)

Applying these established principles "to determine whether in this case [section 8617] bars application of the waiver doctrine, we must ascertain (1) whether [the statute's provisions] are for the benefit of [the parties to an adoption petition] or are instead for a public purpose, and (2) whether there is any language in [the statute] prohibiting a waiver." (*Bickel, supra*, 16 Cal.4th at pp. 1048–1049.)

Addressing the latter point first, we immediately observe that section 8617 contains no language prohibiting the parties to an independent adoption from agreeing to waive its provisions. Rather, section 8617 contains a single sentence: "The birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child." Nor need we move beyond the statute's plain language in order to discern its primary purpose. By its terms, section 8617 exists to "relieve[]" birth parents of "duties towards and all responsibility for, the adopted child" and to assure adoptive parents of exclusive parental control by ending birth parents' "right over the child" from "the time of the adoption." Section 8617 thus affords all the parties to the ordinary adoption an incentive for concluding it. But nothing therein, or in any other statutory provision, prohibits the parties to an independent adoption from waiving the benefits of section 8617 when a birth parent intends and desires to coparent with another adult who has agreed to adopt the child and share parental responsibilities.

█ Since section 8617's provisions are for the benefit of the parties to an adoption petition and the section contains no language prohibiting a waiver (*Bickel, supra*, 16 Cal.4th at pp. 1048–1049), we conclude that section 8617 declares a legal consequence of the usual adoption, waivable by the parties thereto, rather than a mandatory prerequisite to every valid adoption. (*Bickel, supra*, at p. 1048.)[6]

---

[6] In so holding, we do not decide, contrary to what our concurring and dissenting colleagues suggest (see conc. & dis. opn. of Baxter, J., *post*, at p. 453; conc. & dis. opn. of Brown, J., *post*, at p. 463), whether there exists an overriding legislative policy limiting a child to two parents. This case involves only a second parent adoption, so we have no occasion to address that point. Justice Baxter errs, therefore, in asserting that our decision today frees a family court to assign at will "as many legal parents as the lone judge deems in the child's best interest." (Conc. & dis. opn. of Baxter, J., *post*, at p. 453; see also conc. & dis. opn. of Brown, J., *post*, at p. 464.) While the Family Code contains in several sections language suggesting the Legislature may harbor a two-parent policy (see, e.g., §§ 3003, 3011, 3161, 3624, 4071, 7572, 7822, 7840, 8604), those statutes are not in issue. Section 8617, which is in issue, does not

Such a conclusion accords with our previous pronouncements respecting the essential elements of an adoption. The adoption laws always have made a fundamental distinction between the ordinary legal consequences of an adoption and "what provisions of the law are essential and therefore mandatory." (*In re Johnson* (1893) 98 Cal. 531, 536 [33 P. 460].) In *Johnson*, for example, we held that Civil Code former section 227's provision for "the examination of a child under the age of consent" by the judge before the child is adopted "should not be deemed indispensable to the validity of the adoption proceeding." (*In re Johnson, supra*, at p. 539.) In so holding, we noted "it is necessary that there should be a substantial compliance with all of the essential requirements of the law under which the right [of adoption] is claimed; but, in determining what provisions of the law are essential and therefore mandatory, the statute is to receive a sensible construction, and its intention is to be ascertained, not from the literal meaning of any particular word or section, but from a consideration of the entire statute, its spirit and purpose." (*Id.* at p. 536.)

Of course, one "who claims that an act of adoption has been accomplished must show that every essential requirement of the statute has been strictly complied with" (*Estate of Sharon, supra*, 179 Cal. at p. 454), but Sharon points to no California decision stating or even implying that termination of birth parental rights and responsibilities under section 8617 is among these essential requirements.

While California's adoption statutes nowhere concisely define "adoption," they do state the essential elements of a valid adoption. "[A]fter careful consideration of the question as to what requirements are essential, the conclusion was stated [in *In re Johnson, supra*, 98 Cal. 531] as follows: 'The proceeding is essentially one of contract between the parties whose consent is required. It is a contract of a very solemn nature, and for this reason the law has wisely thrown around its creation certain safeguards, by requiring, not only that it shall be entered into in the presence of a judge, but also that it shall receive his sanction, which is not to be given until he has satisfied himself of these three things: 1. That the person adopting is ten years older than the child. 2. That all the parties whose consent is required do consent, fully and freely, to the making of such contract. 3. That the adoption contemplated by the contract will be for the best interest of the child adopted.' These requirements are there held to be jurisdictional. Unless they coexist, the proceeding for adoption is insufficient, the attempted contract is invalid, the judge is without power to approve it, and there is no lawful adoption." (*Estate of Sharon, supra*, 179 Cal. at p. 454, citing several cases.)

speak to parental numerosity, except incidentally to recognize, in its use of the plural "birth parents," that a child ordinarily has two of these.

■ Thus, in current statutory terms, the essential elements of every valid adoption are: a voluntary and informed parental consent to the adoption except where the parent has surrendered or has been judicially deprived of parental control (§§ 8604–8606); a suitable adoptive parent at least 10 years older than, or in a specified preexisting family relationship with, the child (see §§ 8601, 8717, 8801, 8811–8811.5); and a judicial determination that "the interest of the child will be promoted by the adoption" (§ 8612). When these essential elements are present, "the objective of the adoption statutes to protect the interests of both the natural or legal parent(s) and the child through the consent and best interests requirements" is not frustrated when statutory provisions like section 8617 are treated as nonmandatory. (Patt, *Second Parent Adoption: When Crossing the Marital Barrier Is in a Child's Best Interests* (1987–1988) 3 Berkeley Women's L.J. 96, 117, discussing Civ. Code former § 229.)

The Court of Appeal majority failed to recognize this distinction between essential elements and ordinary legal consequences, asserting that the "statutes governing independent adoptions require a relinquishment of parental rights" and "mandate that the parental rights of the birth parent be terminated." In fact, the statutes contain no such mandates.

" 'Independent Adoption' means the adoption of a child in which neither the department nor an agency licensed by the department is a party to, or joins in, the adoption petition." (§ 8524.) In addition to the essential elements of all adoptions set out above, the independent adoption statutes require parental consent after notice and advisement (§§ 8800, 8801.3, 8814, 8821), opportunities under specified conditions timely to revoke consent (§ 8814.5) or with court approval to withdraw it (§ 8815), selection of the adoptive parent or parents by the birth parent or parents personally (§ 8801), advice to the birth parent of his or her rights by an adoption service provider or licensed out-of-state agency (§ 8801.5), execution of an adoption placement agreement satisfying specified requirements on a form prescribed by CDSS (§ 8801.3), administrative investigation by CDSS or its delegate (§§ 8806–8811, 8817), an appropriate petition filed with the superior court, usually in the county in which the petitioner resides (§ 8802), and an appearance before the court by the prospective adoptive parents and the child (§§ 8612, 8613, 8823). Nowhere does any mandate or requirement of relinquishment of a birth parent's rights and responsibilities appear.

Most people who place their children with unrelated adoptive parents presumably desire to be "relieved of all parental duties towards, and all responsibility for, the adopted child," as section 8617 declares, once the adoption is final. But, as noted, section 8617 neither prohibits a birth parent and another qualified adult from jointly waiving application of the statute in

order to coparent an adoptable child, nor prohibits a court under such circumstances from ordering an otherwise valid adoption. (See *Bickel, supra,* 16 Cal.4th at pp. 1048–1049.)[7]

B. *Marshall*

Decades ago, we held that Civil Code former section 229, the predecessor statute to Family Code section 8617, was no bar to second parent adoption of a type—stepparent adoption—that was then not expressly provided for by statute. (*Marshall v. Marshall, supra,* 196 Cal. at p. 767 (*Marshall*).) We agree with the dissenting justice in the Court of Appeal that the considerations we treated as dispositive in *Marshall,* which did *not* include the marital status of the parties, are fully present in the instant case and lead to the same result.

In *Marshall,* the second husband of a widowed mother adopted her two minor children. When the couple later divorced, they agreed the stepfather would pay support for the two children, but that he would surrender his adoption of them and their mother would readopt them. On the mother's petition and with the father's consent, a decree was entered purporting to accomplish the mother's readoption of her children. Thereafter, the superior court entered interlocutory and final orders for child support. (*Marshall, supra,* 196 Cal. at pp. 763–764.) One year later, the father moved to modify the orders by striking the provision for child support. The superior court granted the motion on grounds that, by the time the orders issued, it had lacked jurisdiction to award the child support, because the mother's readoption of the children had changed their status so that they were no longer the "children of the parties" to the divorce action. (*Marshall, supra,* 196 Cal. at p. 764.)

We reversed, holding that the superior court had erred in its determination that the earlier child support orders were void as beyond the court's jurisdiction. (*Marshall, supra,* 196 Cal. at p. 767.) In reaching our conclusion, we

---

[7] *Estate of Jobson* (1912) 164 Cal. 312, 317–318 [128 P. 938], cited by our concurring and dissenting colleagues (see conc. & dis. opn. of Baxter, J., *post,* at p. 453; conc. & dis. opn. of Brown, J., *post,* at p. 458), does not compel a contrary conclusion. Our passing remark in that intestacy case that "duties of a child cannot be owed to two fathers at one time" (*Estate of Jobson, supra,* at p. 317) was dictum uttered in the context of concluding that a birth father who "by virtue of the adoption proceeding [in that case], ceased to sustain the legal relation of father" could not thereafter inherit the adopted person's estate (*ibid.*). As *Jobson* involved an ordinary adoption in which "the natural relationship between the child and its parents by blood is superseded" (*ibid.*), we did not consider the contingency before us today—viz., two parties who voluntarily have waived the benefit of section 8617 in order to effect a second parent adoption, where the natural parent's relationship with the child is not superseded. Our holding that they may waive the statute does not contravene *Jobson*'s holding that an adopted person's relationship with his birth parent, once legally severed, is not automatically "revived by the death of the foster parent" (*Jobson, supra,* at p. 317).

addressed the validity and effect of the prior proceeding where the mother had purported to adopt her own children. Noting that the adoption statutes then, as now, did not contain a definition of the word "adoption" (*id.* at p. 765), we characterized that proceeding as one "by which the adopting parent assumes a parental relationship toward the *child of another*" (*id.* at p. 766). Reasoning that a "natural mother of a child could legally adopt such child only in a case wherein her parental relationship had theretofore been severed as a matter of law" (*ibid.*), we considered whether the stepfather's prior adoption of the children had the effect of legally severing the mother's parental rights and responsibilities. As relevant here, we held it had not, "notwithstanding the provisions of [Family Code section 8617's predecessor] Civil Code, [former] section 229, that 'the parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the child so adopted, and have no right over it.' " (*Marshall, supra,* at p. 766.)

In declining to construe section 8617's predecessor as having severed the mother's parental rights to her children, we noted in *Marshall* that it was "plain from the record of the adoption proceedings," including the terms of the mother's consent and of the adoption order, that the parties "did not intend . . . to sever the parental relationship between the mother and the children" when effecting the latter's adoption by the mother's new spouse. (*Marshall, supra,* 196 Cal. at p. 766.)

Thus, we held in *Marshall* that "although no express authority therefor is to be found in the code, nevertheless a husband and wife may jointly adopt a child pursuant to the procedure therein prescribed, the result of which is to make the child, in law, the child of both spouses." (*Marshall, supra,* 196 Cal. at p. 767, citing *In re Williams* (1894) 102 Cal. 70, 70–79 [36 P. 407].) Section 8617's predecessor was not, we held, "intended to apply to a situation such as this, and to effect a result so plainly opposite to that which was intended" by the parties. (*Marshall, supra,* at p. 767.)

In *Marshall*, we thus effectively read second parent adoption into the statutory scheme, by approving a type of second parent adoption, stepparent adoption, which at that time the adoption statutes did not expressly authorize. (*Marshall, supra,* 196 Cal. at p. 767.) In so doing, we necessarily determined that relinquishment of the birth parent's rights was not essential to adoption and that section 8617's predecessor was not mandatory.

Contrary to the view of the Court of Appeal majority, our determination in *Marshall* that the stepfather's adoption had not severed the mother's parental rights was essential to our conclusion that the trial court had had jurisdiction to enter the child support orders at issue and had erred in setting them aside

as void. Our invalidation of the trial court's order vacating the support orders was based on our conclusion that the mother's purported readoption of her children had been "an utter nullity" (*Marshall, supra,* 196 Cal. at p. 767), as, therefore, was the parties' effort thereby to sever the stepfather's parental relationship (*ibid.*). In order to reach that conclusion we had to determine whether or not the stepfather's prior adoption of the two children had the effect of legally severing the mother's parental relationship with them. (*Id.* at p. 766.) It is on the answer we gave—viz., that "notwithstanding the provisions of Civil Code, section 229," the stepfather's prior adoption of the minors had *not* severed the mother's parental rights (*ibid.*)—that Annette relies. In relying on *Marshall*'s pronouncement that Family Code section 8617's predecessor was not intended by the Legislature "to apply to a situation such as this, and to effect a result so plainly opposite to that which was intended" by the parties (*Marshall, supra,* at p. 767), Annette thus relies on part of our essential reasoning, not on dictum. (See generally *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)

*Marshall* is factually apposite as well. Just as Family Code section 8617 is the clear successor to Civil Code former section 229, the language and forms developed by CDSS and used in this case to effect and document Annette's adoption of Joshua are comparable to those used by the parties in *Marshall*. In *Marshall*, the stepfather's petition for adoption recited that he was a fit person to be allowed " 'joint custody and control' " of the children along with the mother, and the petition prayed for a court order that the stepfather " 'shall jointly together with [the mother] be adjudged on such adoption as having the status of the natural father of said minors.' " (*Marshall, supra,* 196 Cal. at p. 766, italics omitted.) In consenting to the adoption, the children's mother stated that their stepfather would adopt the " 'minors, my children, as his own natural children and . . . in conjunction and jointly with me act, maintain and have the legal status of a father and . . . jointly with me maintain the relationship of a parent to said minors herein mentioned.' " (*Id.* at pp. 766–767, italics omitted.)

Similarly, Sharon signed an adoption consent form stating her intention to retain coparental rights and responsibilities and permitting Annette to assume coparental rights and responsibilities. Annette signed adoption forms clearly stating her intention to accept coparental rights and responsibilities for Joshua to be shared with Sharon. We conclude that, just as its predecessor was not intended by the Legislature "to effect a result so plainly opposite to that which was intended" by the parties in *Marshall, supra,* 196 Cal. at page 767, section 8617 was not intended to bar Annette's adoption of Joshua.

Acknowledging that *Marshall* supports Annette's claim, Justice Brown nevertheless chides us for "read[ing] contemporary norms into a 1925

decision" (conc. & dis. opn. of Brown, J., *post*, at p. 460; see also *id.* at p. 461). In a similar vein, Sharon takes the position that whatever the factual and legal parallels between *Marshall* and this case, *Marshall* "did not consider either unmarried adopting parents or same-sex adoptions" and therefore is "too factually and legally different to be relevant." We disagree. Although we mentioned in *Marshall* that the adoption involved was by a husband, we said nothing to suggest we regarded the presence of marriage as bearing on our implicit treatment of section 8617's predecessor as waivable and not mandatory. (See *Marshall, supra*, 196 Cal. at p. 767.)

California's adoption statutes have always permitted adoption without regard to the marital status of prospective adoptive parents. Section 8600 provides that "[a]n unmarried minor may be adopted by an adult," and an adult may adopt a child so long as he or she is "at least 10 years older than the child" (§ 8601, subd. (a)). Section 8542 defines "prospective adoptive parent" as "a person who has filed or intends to file a petition . . . to adopt a child who has been or who is to be placed in the person's physical care . . . ." None of these statutes mentions marital status. Under these circumstances, no justification appears for treating section 8617 differently in this case than we did its predecessor in *Marshall*.[8]

In the years since *Marshall* was decided, the Legislature has reorganized and reenacted the adoption statutes[9] and amended them many times, inter alia, to acknowledge stepparent adoptions (§§ 9000–9007) and define them as "an adoption of a child by a stepparent where one birth parent retains custody and control of the child" (§ 8548). In doing so, the Legislature has neither repudiated *Marshall* nor expressly excepted stepparent adoptions from application of section 8617. " 'There is a strong presumption that when the Legislature reenacts a statute which has been judicially construed it adopts the construction placed on the statute by the courts.' " (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134].) That is because, " '[w]hen the Legislature amends a statute without changing those portions . . . that have previously been construed by the courts, the Legislature is presumed to have known of and to have acquiesced in the previous judicial construction.' " (*People v. Atkins* (2001) 25 Cal.4th 76, 89–90 [104

---

[8] Consistently with this conclusion, CDSS, the administrative agency that oversees the county child welfare agencies that perform home studies in all adoption cases, has determined that unmarried couples who seek to adopt are to be evaluated on the same basis as married couples. (CDSS, All County Letter No. 99-100 (Nov. 15, 1999); see *ante*, fn. 3.)

[9] "Effective January 1, 1994, the Legislature repealed the Civil Code sections governing adoption and reenacted them as part of the new Family Code. (Stats. 1992, ch. 162, §§ 4, 10.) There is no substantive difference between the relevant sections of the Family Code and their predecessors in the Civil Code." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1049, fn. 1 [43 Cal.Rptr.2d 445, 898 P.2d 891].)

Cal.Rptr.2d 738, 18 P.3d 660].) Moreover, when comprehensively reorganizing the adoption statutes in 1990, the Legislature replaced the version of section 8617's predecessor that we construed in *Marshall*, Civil Code former section 229, with another version containing immaterial changes (Civ. Code, former § 221.76). In so doing, the Legislature expressly stated that it did not intend thereby "to lose legislative history or judicial precedent [including necessarily *Marshall*] applicable to statutory provisions replaced by this act." (Civ. Code, former § 220.10, subd. (e); see generally Stats. 1990, ch. 1363, § 3, pp. 6055–6066.)

Thus, for more than 75 years, the Legislature has acquiesced in *Marshall*'s treatment of section 8617's predecessor, implying that an adoption court may order an otherwise valid adoption in which the parties plainly have stated their intention to waive section 8617's benefits.

We long have recognized that if the Legislature enacting a specific adoption provision did not intend compliance with that provision to be jurisdictional, " 'strict and literal adherence to the letter and form' " of that statute is not required to effect a valid adoption. (*Estate of Johnson, supra,* 98 Cal. at p. 539; see also *Adoption of Baby Girl B.* (1999) 74 Cal.App.4th 43, 54 [87 Cal.Rptr.2d 569].) As noted, section 8617 contains no mandate or requirement of termination. Rather, the statute simply describes how birth parents ordinarily are relieved of all parental rights and duties after an adoption. Because the Legislature presumptively was aware of *Marshall*'s treatment of Civil Code former section 229 as waivable, its retention of parallel language in Family Code section 8617 requires that we "construe the present provision . . . in conformity with the established judicial interpretation." (*Malcolm v. Superior Court* (1981) 29 Cal.3d 518, 528 [174 Cal.Rptr. 694, 629 P.2d 495].)

On their face, moreover, the adoption statutes reveal the Legislature's understanding that while ordinarily "[t]he birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child" (§ 8617), adoptions based on modified application of that principle, wherein "one birth parent retains custody and control of the child" (§ 8548, referencing stepparent adoptions), may exist. (See also *Nancy S. v. Michele G.* (1991) 228 Cal.App.3d 831, 841, fn. 8 [279 Cal.Rptr. 212] [judicially recognizing the same with respect to second parent adoptions].) Sharon acknowledges that for us to construe section 8617 literally as a "general provision" mandating termination of all birth parents' rights in every adoption would be contrary to the stepparent adoption provisions. But she contends that, nevertheless, "section 8617 must apply to all Chapter 3 Independent Adoptions," regardless of the parties' intent.

Certainly the stepparent adoption provisions contain no such suggestion. Those statutes neither expressly nor impliedly bar an independent adoption by a second parent that preserves the child's legal relationship with one birth parent. In fact, the stepparent adoption provisions make no mention of independent adoption. Contrary to Justice Brown's assertions (see conc. & dis. opn. of Brown, J., *post*, at pp. 458, 461), that the Legislature, when defining stepparent adoption, noted that "one birth parent retains custody and control of the child" (§ 8548) neither logically nor historically implies an intent to confine to the stepparent context our implication in *Marshall, supra*, 196 Cal. 761, that a birth parent consenting to an adoption may waive termination of her parental rights. The scant legislative history available suggests that the Legislature, when originally adopting that language, sought only to relieve CDSS's predecessor of certain administrative burdens in adoptions that were being conducted by stepparents.[10] Moreover, any suggestion that the statutory availability of stepparent adoption implies legislative disapproval of other kinds of second parent adoption is belied by the possibility[11] of second parent adoptions being effected through agency procedures. (See § 8700 et seq.)[12]

---

[10] Compare Statutes 1927, chapter 691, section 3, page 1197 (first modern revision of Civ. Code, former § 226 to require CDSS's predecessor in every nonagency adoption to witness consents, verify allegations, and determine the adoptability of the child and the suitability of the home) with Statutes 1931, chapter 1130, section 3, page 2402 (amending Civ. Code, former § 226 to retain those requirements "except in the case of an adoption by a step-parent where one natural parent retains his or her custody of the child"). See also tenBroek, *California's Adoption Law and Programs* (1955) 6 Hastings L.J. 261, 266 (relating that the former Department of Social Welfare requested the 1931 amendment because "almost all of the 425 stepparent petitions investigated in the two years 1928–1929 had been favorably recommended and that the time of its limited staff could be better spent on actual placement cases").

[11] After CDSS confirmed the possibility in a letter brief filed by the Attorney General, the Court of Appeal observed that the equivalent of a second parent adoption may be accomplished through an agency adoption in which the birth parent relinquishes her or his rights to the custody and control of the child to the adoption agency or adoption district office, but expressly designates the adoptive parents to be herself or himself and the prospective second parent.

[12] We are not persuaded, as Justice Brown speculates, that the Legislature's 1993 amendment of provisions for adoption of adults expressly to preserve rights and responsibilities of a birth parent when the birth parent's spouse is adopting the birth parent's child (§ 9306, subd. (b)), constitutes or recognizes a "statutory restriction on second parent adoptions" of children. (See conc. & dis. opn. of Brown, J., *post*, at p. 458.) Justice Brown opines on the basis of comments in a cursory legislative committee report that the 1993 amendment "served [the same] purpose" as is served by section 8548, the statutory definition of stepparent adoption (conc. & dis. opn. of Brown, J., *post*, at p. 459), but she nowhere demonstrates that section 8548 either constitutes or recognizes, as we have concluded it does not, a statutory restriction on second parent adoptions.

## C. *Administrative Construction and Practice*

Established administrative construction and practice to which we owe substantial deference buttress the aforestated legal arguments for reversal. While taking ultimate responsibility for the construction of a statute, we accord "great weight and respect to the administrative construction" thereof. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see also *Styne v. Stevens* (2001) 26 Cal.4th 42, 53 [109 Cal.Rptr.2d 14, 26 P.3d 343] [administrator's "interpretation of a statute he is charged with enforcing deserves substantial weight"].) CDSS has adopted the view that "[a] petition or an application for a limited consent or limited relinquishment adoption, in which a birth parent, or adoption parent, simultaneously retains parental rights and consents [to the adoption], agrees [to the adoption], or designates the adoptive parent of his or her child [to be] an unrelated adult, is to be reviewed on its merits pursuant to the California Family Code." (CDSS, All County Letter No. 99-100 (Nov. 15, 1999); see *ante*, fn. 3.)[13]

Deference to administrative interpretations always is "situational" and depends on "a complex of factors" (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 12), but where the agency has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to correspondingly greater weight (*id.* at pp. 12–15). CDSS indisputably is familiar with the independent adoption provisions as well as with the entire scheme of the adoption law it enforces, and its interpretation of section 8617 comes from authoritative legal and policymaking levels of the agency. Accordingly, this is a case in which the administrative construction would appear to be entitled to great weight. In any event, as it is not clearly erroneous, we owe substantial deference to CDSS's views of section 8617 as waivable and of second parent adoptions as valid under the

---

[13] Our concurring and dissenting colleagues correctly observe that CDSS practice prior to November 15, 1999, included periods both of opposing and of not opposing adoptions by unmarried couples, generally. (See conc. & dis. opn. of Baxter, J., *post*, at pp. 448–450; conc. & dis. opn. of Brown, J., *post*, at p. 459.) As Justice Brown also correctly points out, CDSS itself ultimately recognized that any former policy of categorical opposition was "an underground regulation inconsistent with the Administrative Procedure Act [(APA)]" (CDSS, All County Letter No. 99-100 (Nov. 15, 1999)), such as we have recognized is "void for failure to comply with the APA" (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576 [59 Cal.Rptr.2d 186, 927 P.2d 296]). We know of no authority for Justice Brown's apparent implication (see conc. & dis. opn. of Brown, J., *post*, at p. 459) that CDSS, before acknowledging the invalidity of such an underground regulation and returning to "case-by-case" consideration of second parent adoption petitions "on [their] merits pursuant to the California Family Code" (CDSS, All County Letter No. 99-100 (Nov. 15, 1999), was required to comply with APA notice and comment procedures for the promulgation of regulations. (See *Tidewater Marine Western, Inc., supra*, at pp. 574–575 [noting a regulation will "apply generally" and "predicts how the agency will decide future cases"].)

independent adoption laws. (*Kelly v. Methodist Hospital of So. California* (2001) 22 Cal.4th 1108, 1118 [95 Cal.Rptr.2d 514, 997 P.2d 1169].)

## D. *Public Policy*

Several important considerations of public policy also buttress our conclusion. Precisely how many second parent adoptions have been granted in California over the years is difficult to know, partly because adoption proceedings are generally confidential (see § 9200 et seq.), but published materials suggest they number 10,000 to 20,000.[14] That the second parent adoption procedures promulgated by CDSS under the independent adoption statutes have received such widespread acceptance and have been so extensively used speaks not only to their utility in the modern context, but to their effectiveness in promoting the fundamental purposes that adoption has always served.

### 1. *Fundamental purposes of adoption*

The basic purpose of an adoption is the "welfare, protection and betterment of the child," and adoption courts ultimately must rule on that basis. (*Reeves v. Bailey* (1975) 53 Cal.App.3d 1019, 1022–1023 [126 Cal.Rptr. 51].) While the child's "best interest" is "an elusive guideline that belies rigid definition," obviously overall "[i]ts purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856].) That there are a variety of "costs" if a legal relationship with a second parent is not established— costs that can be both financial and emotional" is well recognized. (Doskow, *The Second Parent Trap, supra,* 20 J. Juv. L. at p. 9.) Second parent adoption can secure the salutary incidents of legally recognized parentage for a child of a nonbiological parent who otherwise must remain a legal stranger.

Second parent adoptions also benefit children by providing a clear legal framework for resolving any disputes that may arise over custody and

---

[14] See, e.g., Pizer, *What About the Children?* (Nov. 9, 2001) The Advocate, p. 1 <http://www.advocate.com/html/stories/850/850_lambda_pizer.asp> (as of Aug. 4, 2003) ("Between 10,000 and 20,000 California families have been made secure and reassured through this process, just like families in nearly two dozen other states across the country"); Tuller, *Now You're a Parent, Now You Aren't* (Nov. 28, 2001) Salon.com, p. 1 <http://archive.salon.com/mwt/feature/2001/11/28/illegal_adoption/index.html> (as of Aug. 4, 2003) (estimating the Court of Appeal decision in this case placed "10,000 to 15,000 previously completed" second parent adoptions in doubt); Curtis, *Analysis: Gay Adoptions Get Boost from New California Law, Support from Pediatricians* (Apr. 2, 2002) Christian Times on the Web, p. 1 <http://www.christiantimes.com/Articles/Articles20Apr02/Art_Apr02_10.html> (as of Aug. 4, 2003) (citing the Court of Appeal decision in this case as "throwing the legitimacy of more than 10,000 adoptions statewide into question").

visitation. Our explicitly recognizing their validity will prevent uncertainty, conflict, and protracted litigation in this area, all of which plainly are harmful to children caught in the middle.[15] Unmarried couples who have brought a child into the world with the expectation that they will raise it together, and who have jointly petitioned for adoption, should be on notice that, if they separate, the same rules concerning custody and visitation as apply to all other parents will apply to them.

In addition, second parent adoptions offer the possibility of obtaining the security and advantages of two parents for some of California's neediest children, including many with "special needs" for whom a second parent adoption may constitute the "closest conceivable counterpart of the relationship of parent and child" available. (*Adoption of Barnett, supra,* 54 Cal.2d at p. 377.) The same is true as regards thousands of others in foster care for whom it is state policy to seek permanent adoptive placement.[16]

We need not review here the nonlegal benefits of adoption for children, parents, and society as a whole, nor need we "assume, either as a policy or factual matter, that adoption is necessarily in a child's best interest" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 845 [4 Cal.Rptr.2d 615, 823 P.2d 1216]) in every case. We may observe, however, that neither the Court of Appeal nor any party or amici curiae has suggested that, where an adoption *would* be in a child's best interests, second parent adoption differs categorically from other types of independent adoption in its ability to achieve adoption's practical ends.

Amicus curiae Proposition 22 Legal Defense and Education Fund suggests that to affirm the statutory permissibility of second parent adoption "would offend the State's strong public interest in promoting marriage." We disagree. ▮ This case involves independent adoption, a procedure that is not limited to married persons. Unmarried persons always have been permitted to adopt children. (See 1 Ann. Civ. Code, § 221 (1st ed. 1872, Haymond & Burch, commrs. annotators [any adult may adopt any eligible child]; Fam. Code, § 8600 [same].) More generally, Justice Brown argues at some length that our

---

[15] See generally *Adoption of Michael H., supra,* 10 Cal.4th at page 1072 (conc. & dis. opn. of Kennard, J.).

[16] It is "the policy of the Legislature that . . . children have a right to a normal home life free from abuse, that reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship is more suitable to a child's well-being than is foster care, that this state has a responsibility to attempt to ensure that children are given the chance to have happy and healthy lives . . . ." (Welf. & Inst. Code, § 396; see generally Fam. Code, § 8730 et seq. [adoptions by foster parents or relative caregivers].) In 1996, there were 97,000 children living in foster care in California, but only about 6,000 adoptions. Approximately one-fourth of adoptions from foster homes by foster parents were by unmarried adults. (Editorial, *Wrongheaded Adoption Rule,* Fresno Bee (Oct. 12, 1996) p. B6.)

decision today "trivializes family bonds." (Conc. & dis. opn. of Brown, J., *post*, at p. 463; see generally *id.* at pp. 463–465.) To the contrary, our decision encourages and strengthens family bonds. As Justice Scalia has noted, the "family unit accorded traditional respect in our society . . . includes the household of unmarried parents and their children." (*Michael H. v. Gerald D.* (1989) 491 U.S. 110, 123, fn. 3 [105 L.Ed.2d 91, 109 S.Ct. 2333].)[17]

Justice Brown purports to discern a legislative "insistence that the adopting parent have a legal relationship with the birth parent" (conc. & dis. opn. of Brown, J., *post*, at p. 464), but she cites no authority for the existence of such a requirement, and we know of none. Established legislative policy " 'bases parent and child rights on the existence of a parent and child relationship rather than on the marital status of the parents.' " (*Johnson v. Calvert* (1993) 5 Cal.4th 84, 89 [19 Cal.Rptr.2d 494, 851 P.2d 776] [discussing Uniform Parentage Act]; see also § 7602 ["The parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents"].)

The Court of Appeal recited that "in 1997 and 1998, the Legislature considered, but did not adopt, a bill that would have provided that two unmarried adults may adopt a child," thereby implying that the Legislature had considered and rejected the possibility of such adoptions. (See Assem. Bill No. 53 (1997–1998 Reg. Sess.) §§ 1, 2 (hereafter Assembly Bill 53).) Not so. Although the Court of Appeal's remark correctly describes Assembly Bill 53, a bill introduced in that session, it misleads to the extent it invites readers to assume the Legislature's inaction on the bill reflected a rejection of its substance.

Assembly Bill 53 dealt with adoption by single persons, as well as by unmarried couples, and was promulgated to nullify a proposed CDSS regulation that the bill's proponents perceived would inhibit both. (See Assembly Bill 53, § 1, subd. (c) ["Excluding potential adoptive parents on the basis of marital status is not in the best interests of the children who are eligible for adoption"].) The proposed regulation giving rise to Assembly Bill 53 would have barred agency recommendation of any adoption by an unmarried person or persons. (See Notice of Proposed Changes in Regulations of the California Department of Social Services (CDSS), Cal. Reg. Notice Register 96, No. 29,

---

[17] Justice Brown states she would find "reasonable any legislative provision requiring that adopting parents share a common residence" (conc. & dis. opn. of Brown, J., *post*, at p. 464, citing § 297, subd. (b)(1) [common residence requirement for domestic partner registration]), but she does not claim the adoption statutes contain any such across-the-board requirement. Nor does Justice Brown explain what bearing her remark might have on the legality or utility of second parent adoption. She does not demonstrate that living apart is a greater phenomenon among couples who utilize second parent adoption procedures than it is among couples who utilize other procedures or, indeed, among parents generally.

p. 446 [proposing adoption of Cal. Code Regs., tit. 22, § 35124].)[18] Promulgated in response, Assembly Bill 53 would have added to the Family Code a new section explicitly restating what is already implicitly provided in sections 8600 and 8601, i.e., that any otherwise qualified single adult or two adults, married or not, may adopt a child. (See Assembly Bill 53, § 2.) After the proposed regulation was withdrawn, the responsive bill (i.e., Assembly Bill 53), which had passed the Assembly Committee on the Judiciary by a vote of 10–4, died in the inactive file. (Assem. Bill No. 53, Assem. Final Hist. (1997–1998 Reg. Sess.).)

Sharon argues that reversal of the Court of Appeal's decision will permit CDSS to authorize unusual adoptions, e.g., involving multiple parties, far removed from those contemplated by the Legislature. Justice Baxter also expresses concern that our decision will lead to "new and even bizarre family structures" (conc. & dis. opn. of Baxter, J., *post*, at p. 451), while Justice Brown inexplicably refers to our supposed "irretrievabl[e] commit[ment] to . . . the-more-parents-the-merrier view of parenthood" (conc. & dis. opn. of Brown, J., *post*, at p. 463). Nonsense. While CDSS has for some time treated section 8617 as waivable, such scenarios have not materialized. Our explicit recognition in this case of the legal ground for second parent adoptions—a nonmandatory construction of section 8617 that comports with judicial precedent and ratifies administrative interpretation and practice in which the Legislature has acquiesced—obviously cannot be taken as authority for multiple parent or other novel adoption scenarios. Nothing we say in this case can validate an adoption that is not in the child's interest, omits any essential statutory element, or is in violation of a public policy the Legislature may express. CDSS's construction honors the established principle that the beneficiary of a statute may waive it, is consistent both with judicial precedent and discernible legislative intent, and serves the best interests of California's children.

In sum, adherence to the Court of Appeal's construction of section 8617 as precluding second parent adoption would unnecessarily eliminate access to a duly promulgated, well-tested adoption process that has become "routine in California" (Eskridge & Hunter, Sexuality, Gender and the Law (1997) p. 866) and that is fully consistent with the main purpose of the adoption statutes to promote "the welfare of children 'by the legal recognition and regulation of the consummation of the closest conceivable counterpart of the relationship of parent and child' " (*Department of Social Welfare v. Superior Court, supra*, 1 Cal.3d at p. 6).

---

[18] Annette and Sharon each have submitted a request for judicial notice of legislative history materials generally available from published sources. We deny both requests as unnecessary. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1988) 19 Cal.4th 26, 46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

## 2. *Settled familial expectations*

The Court of Appeal's implication that California courts lack jurisdiction to grant second parent adoptions potentially called into question the legitimacy of existing families heretofore created in this state through established administrative and judicial procedures. Such families are of many types.

Although second parent adoptions may involve children conceived, as in this case, by artificial insemination,[19] others involve children placed directly by their birth parents or private agencies with two unmarried adoptive parents. (See generally 1 Hollinger, Adoption Law and Practice (2002) Placing Children for Adoption, §§ 3.01–3.02, pp. 3-3 through 3-18.)[20] Others involve dependent children, often with special needs because of prior abuse or neglect, who were placed by public agencies with an unmarried "fost-adopt" parent whose partner later became a second adoptive parent. Still others are "kinship" adoptions, in which a grandparent or other relative became a second legal parent of a child whose very young mother was unable to raise the child on her own. Such adoptions also have involved children born in other countries and adopted either in their country of origin or in California by an unmarried adult whose partner later became a second adoptive parent. (1 Hollinger, Adoption Law and Practice, *supra*, §§ 3.01–3.02, pp. 3-3 through 3-18.) Established practice in California thus has created settled expectations among many different types of adoptive families.[21] Affirmance would unnecessarily risk disturbing these.

---

[19] Such children otherwise would have only one parent, as in California a mere sperm donor is not a legal parent. (§ 7613, subd. (b).)

[20] "Second parent adoptions may occur when a child's heterosexual parents are unable or unwilling to marry and establish paternity or when the parents are lesbian or gay." (Bryant, *Second Parent Adoption: A Model Brief* (1995) 2 Duke J. of Gender L. & Pol'y 233, 233, fn. omitted; see also Ellis, *Bitterly Opposed Adoption Rule Died Quiet Death*, L.A. Times (Nov. 29, 1998) p. A1 [reporting that most unmarried couples who adopt are heterosexual]; see, e.g., Patt, *Second Parent Adoption: When Crossing the Marital Barrier Is in a Child's Best Interests, supra*, 3 Berkeley Women's L.J. at pp. 128–130, citing *In re Adoption Petition of D.J.L.* (Super. Ct. San Diego County, 1988, No. A-28,345) [second parent adoption granted to child's mother and former stepfather after they divorced]; *In re Adopting Parent* (Super. Ct. Riverside County, 1985, No. A-10,169) [same].)

[21] California practice accords with the national trend. As of 2001, at least 21 American jurisdictions had recognized second parent adoption. (Lilith, *The G.I.F.T. of Two Biological and Legal Mothers* (2001) 9 Am.U. J. Gender, Soc. Pol'y & L. 214.) The highest state courts in Massachusetts, New York and Vermont expressly have permitted second parent adoption without requiring termination of the birth parent's rights. (See *Adoption of Tammy* (Mass. 1993) 416 Mass. 205 [619 N.E.2d 315]; *In re Jacob* (1995) 86 N.Y.2d 651 [660 N.E.2d 397, 636 N.Y.S.2d 716]; *Adoption of B.L.V.B. and E.L.V.B.* (1993) 160 Vt. 368 [628 A.2d 1271].) The remainder have permitted second parent adoptions at intermediate appellate and lower court levels.

Affirmance not only would cast a shadow of uncertainty over the legal relationships between thousands of children and their adoptive parents (contrary to the clearly stated intention of all interested parties), but potentially could prompt some adoptive parents to disclaim their established responsibilities. Indeed, as the Court of Appeal dissenter noted, perpetuating the Court of Appeal opinion "would invite attempts to nullify completed second party adoptions in myriad species of litigation including support/custody/visitation disputes, inheritance contests and withdrawals of entitlements to previously available health and pension benefits, both governmental and private. The ultimate financial and emotional losers will be children who are the intended beneficiaries of the adoption laws."

Sharon errs in asserting that, even if we were to affirm, persons who previously had completed a second parent adoption would have remedies such as compliance with the domestic partner registration provisions (§ 297 et seq.)[22] if they wish to "ratify" the earlier proceeding. Domestic partner registration constitutes no such panacea. ■ With an exception for some seniors, California's domestic partner registry is open only to same-sex couples, and not to heterosexuals. (§ 297, subd. (b)(6).)

■ Registered domestic partners, moreover, must have a common residence (§ 297, subd. (b)(1)), thus excluding qualified adoptive parents who might live apart for reasons having no bearing on whether an adoption is in a particular child's interest. Similarly, blood relatives cannot register, and therefore cannot adopt, as domestic partners (*id.*, subd. (b)(4)), even though many modern adoptions are kinship adoptions. (See 1 Hollinger, Adoption Law and Practice, *supra*, Placing Children for Adoption, §§ 3.01–3.02, pp. 3-3 through 3-18.) And families that have moved out of state, or where one adoptive parent has died, will not be able to seek ratification as domestic partners.[23] Even for parents who are legally qualified to register as domestic partners, undertaking a "re-adoption" would pose financial hardship and painful legal uncertainty.[24] No parent should have to face these kinds of choices, and no child should be placed in this kind of needless jeopardy.

---

[22] Added by Statutes 1999, chapter 588, section 2; amended by Statutes 2001, chapter 893, section 3.

[23] Additionally, privacy concerns undermine the utility of domestic partner registration for some qualified adoptive parents who require confidentiality. While records in adoption cases generally are confidential (§ 9200 et seq.), domestic partner registration requires a declaration that the couple shares "an intimate and committed relationship," in a document generally subject to public disclosure. (§ 298.5; 84 Ops.Cal.Atty.Gen. 55 (2001).)

[24] Forcing established adoptive families to return to court to ratify their family ties would burden the justice system with re-addressing consensual arrangements that have already been administratively and judicially ratified. Such duplication hardly would constitute the "prompt resolution of adoption proceedings" (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 851) on which we consistently have placed a priority.

Nothing on the face of the domestic partnership provisions, or in their history as revealed in the record, states or implies a legislative intent to forbid, repeal, or disapprove second parent adoption or CDSS's forms and procedures facilitating such. Thus, contrary to Justice Brown's assertion, the Legislature's conferring on domestic partners "the right . . . to adopt a child of his or her partner *as a stepparent*" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 25 (2001–2002 Reg. Sess.) as amended Sept. 7, 2001, pp. 1–2, italics added), far from "confirm[ing] its understanding" that second parent adoption was not available (conc. & dis. opn. of Brown, J., *post*, at p. 459), simply streamlines the adoption process for a subset of those who already were accessing second parent procedures, much as occurred in 1931 when the Legislature streamlined stepparent adoption itself. (See *ante*, fn. 10.) Domestic partner registration does not broadly secure for California's children the benefits of the availability of second parent adoption, nor does it eliminate the uncertainty the Court of Appeal's decision created for existing second parent adoptees and their parents.

## II. *Constitutional Considerations*

Sharon, in opposing review, specified two additional questions: whether Annette's adoption of Joshua would violate the constitutional doctrine of separation of powers and whether the adoption would violate Sharon's due process rights under the Fourteenth Amendment to the United States Constitution.

### A. *Separation of Powers*

In promulgating forms and procedures to facilitate second parent adoptions, Sharon asserts, CDSS—an agency of the executive branch of our state government—is improperly engaging in the equivalent of legislation. She cites three Court of Appeal cases discussing child visitation, apparently for the proposition that courts should leave innovation in adoption policy to the Legislature. (See *West v. Superior Court (Lockrem)* (1997) 59 Cal.App.4th 302 [69 Cal.Rptr.2d 160] (*West*); *Nancy S. v. Michele G.*, *supra*, 228 Cal.App.3d 831 *(Nancy S.)*; *Curiale v. Reagan* (1990) 222 Cal.App.3d 1597 [272 Cal.Rptr. 520] (*Curiale*).) With that proposition generally, we do not disagree. But, as discussed, second parent adoption is the status quo in California, not an innovation.

The cases Sharon cites are not apposite. They all address the jurisdiction of California courts to award visitation to a "de facto" parent; none addresses

the validity of an adoption.[25] Annette is not seeking custody of Joshua on the basis of her past relationship as caregiver to him, nor on any other equitable theory. Rather, she seeks finalization of an independent adoption, with at least partial custody as one of its incidents. In passing on the validity of these adoption proceedings, we have no occasion to address de facto parenthood.

In any event, in suggesting that de facto parenthood involves policy questions best left to the Legislature (see *West, supra,* 59 Cal.App.4th at p. 307; *Nancy S., supra,* 228 Cal.App.3d at p. 841; *Curiale, supra,* 222 Cal.App.3d at pp. 1600–1601), the courts in the cases Sharon cites did not hold that any judicial action in this area would be unconstitutional. And to the extent each relied partly on a de facto parent's failure to adopt the child involved, they impliedly recognized the viability of second parent adoption under existing statutes. (See *West, supra,* at p. 304; *Nancy S., supra,* at p. 841; *Curiale, supra,* at p. 1599; see also *In re Guardianship of Z.C.W.* (1999) 71 Cal.App.4th 524, 527 [84 Cal.Rptr.2d 48].) The Court of Appeal in *Nancy S.,* citing our *Marshall* decision for support, expressly found "nothing in these provisions that would preclude a child from being jointly adopted by someone of the same sex as the natural parent." (*Nancy S., supra,* at p. 841, fn. 8.)

Sharon concedes the Legislature authorized CDSS to promulgate for use in the independent adoption process a form adoption placement agreement (§ 8801.3, subd. (b)) that includes a consent to the adoption (*id.,* subd. (c)(5)), but urges that CDSS "has no power by regulation or otherwise to add to or detract from the rules for adoption prescribed in the Civil [now Family] Code" (*Adoption of McDonald, supra,* 43 Cal.2d at p. 461). As we have explained at length, however, in interpreting the independent adoption statutes to permit parental consent to a second parent adoption where the procedural prerequisites thereto and the essential elements of a valid adoption are satisfied, CDSS does not "add to or detract from" those statutes but, rather, construes them reasonably.

## B. *Due Process*

Sharon in her brief on the merits expressly refrains from arguing that Annette's adoption of Joshua would violate her due process rights, but in opposing review she suggested this case presents that question. She cited in support *Troxel v. Granville* (2000) 530 U.S. 57, 75 [147 L.Ed.2d 49, 120

---

[25] "The de facto parenthood doctrine simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 77 [23 Cal.Rptr.2d 775, 859 P.2d 1290].)

S.Ct. 2054] (*Troxel*), wherein a plurality of the high court held that a Washington State statute providing that any person may at any time petition for visitation of an unrelated child, and that the court may order such visitation when it is in the child's best interest, violated the birth mother's substantive due process rights.

*Troxel* is readily distinguishable. Most fundamentally, *Troxel* was a visitation case, whereas this case involves an adoption, and in California the statutes and procedures governing adoption are different from those governing visitation. (Compare generally §§ 3100–3103 with §§ 8600–9206.) The Washington statute at issue in *Troxel* provided specifically that "[*a*]*ny person* may petition the court for visitation rights *at any time*" and that courts may award visitation whenever "visitation may serve the best interest of the child" (Wash. Rev. Code, § 26.10.160(3), italics added). Calling this language "breathtakingly broad," the high court noted it "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." (*Troxel, supra,* 530 U.S. at p. 67, 120 S.Ct. 2054.) California law provides for no such freestanding visitation proceeding. Nor is Annette just "any person" (Wash. Rev. Code, § 26.10.160(3)); she is a prospective adoptive mother.

The statute at issue in *Troxel* did not require parental consent (or a finding of parental unfitness), and it was that fact, primarily, that led to its invalidation. (See *Troxel, supra,* 530 U.S. at pp. 67–70.) While Sharon now wishes to terminate these proceedings, she does not deny that she originally joined Annette in invoking the superior court's adoption jurisdiction (§ 200) or that she failed to revoke her consent within the prescribed statutory period (§ 8814.5, subd. (b)).

In short, *Troxel* neither involved nor discussed adoption. Nor, as discussed, are the California adoption statutes subject to the constitutional criticisms the high court leveled there against Washington's visitation statute.

For the foregoing reasons, we conclude that neither due process nor the doctrine of separation of powers constitutes a bar to Annette's adoption of Joshua. Consequently, section 8617 does not prevent the superior court from proceeding to a best interests analysis of Annette's petition. (§ 8612.)

III. *Fraud and Duress*

As noted at the outset of this opinion, in requesting approval to withdraw her consent to the adoption, Sharon, in addition to the statutory and constitutional objections reviewed above, argued to the trial court that she had signed the adoption consent form under fraud, undue influence, and duress and that

the original adoption attorney representing her and Annette had failed to obtain a signed waiver regarding conflict of interest. In her writ petition, Sharon reprised these arguments.

■ With a few statutory exceptions not relevant here, a legal parent's valid consent is a jurisdictional prerequisite to an adoption, regardless of the child's interests. (See *In re Adoption of Cozza* (1912) 163 Cal. 514, 523 [126 P. 161], disapproved on another ground in *Adoption of Barnett, supra,* 54 Cal.2d at p. 378.) Where a parent's consent to adoption is obtained through fraud or duress, the consent "is not voluntary and the jurisdictional prerequisite to a valid adoption is lacking." (*Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 751 [278 Cal.Rptr. 907]; see also *In re Yoder* (1926) 199 Cal. 699, 701 [251 P. 205] [order of adoption may be set aside for fraud, mistake, inadvertence, surprise, or excusable neglect].) Since the Court of Appeal agreed with Sharon's statutory argument, it had no occasion to address the superior court's implicit rejection of her contentions respecting fraud and undue influence. We shall remand the cause to permit the Court of Appeal to address this issue in the first instance. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 95 [124 Cal.Rptr.2d 530, 52 P.3d 703]; *Lisa M. v. Henry Mayo Newhall Memorial Hosp.* (1995) 12 Cal.4th 291, 306 [48 Cal.Rptr.2d 510, 907 P.2d 358].)

Subject to the Court of Appeal's resolution of this remaining issue, the superior court on remand may validly exercise its discretion to order Annette's adoption of Joshua under the independent adoption statutes if it concludes that the administrative procedures, including a section 8617 waiver, duly established thereunder have been complied with and that all statutory prerequisites are satisfied. Sharon retains the right to oppose finalization of the adoption on the ground that new circumstances make it contrary to Joshua's interests. (See *County of Los Angeles v. Superior Court* (1969) 2 Cal.App.3d 1059, 1065–1066 [82 Cal.Rptr. 882].) We take no position on such outstanding factual questions, and nothing in this opinion should be taken by the court below on remand to indicate a view as to whether adoption is in Joshua's interests.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the Court of Appeal and remand the cause for further proceedings consistent with this opinion.

George, C. J., Kennard, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—The majority's principal holding—which recognizes second parent adoptions[1] as valid in California—is unremarkable. At least 20 other jurisdictions have already done so (Krause & Meyer, *What Family for the 21st Century?* (2002) 50 Am. J. Comp. L. 101, 114, fn. 23), including the highest courts of three sister states. (Maj. opn., *ante*, at p. 441, fn. 21, citing *Adoption of Tammy* (1993) 416 Mass. 205 [619 N.E.2d 315]; *Matter of Jacob* (1995) 86 N.Y.2d 651 [660 N.E.2d 397, 636 N.Y.S.2d 716]; *Adoption of B.L.V.B.* (1993) 160 Vt. 368 [628 A.2d 1271].) I join fully in that holding.

I part company with the majority, however, over its interpretation of Family Code section 8617 (section 8617), which states that from the time of adoption, the birth parent shall "have no right over the child." I would hold that the parties to an adoption may waive section 8617 in the limited circumstance of a second parent adoption. This is sufficient to resolve the case. Unfortunately, the majority does not stop there but makes the additional holding that section 8617 is a nonmandatory consequence of an adoption and can be waived *whenever* the parties agree to do so. (Maj. opn., *ante*, at pp. 427, 429, 440.) Under the majority's approach, section 8617's termination of the birth parents' rights in *any* type of adoption—not merely those that seek to add a second parent—can be waived by mutual agreement, thus permitting a child to have three or more parents.

This makes new law, not only here but nationwide. Other states—even those states that have already validated second parent adoptions—have not taken this step. (E.g., *Adoption of B.L.V.B., supra,* 628 A.2d at p. 1274, fn. 3 [declining to characterize a Vermont termination-of-rights statute as "directory rather than mandatory"]; see also *In Interest of Angel Lace M.* (1994) 184 Wis.2d 492 [516 N.W.2d 678, 683–684] [construing a similar Wisconsin termination-of-rights statute as mandatory].)[2] I find this out-of-state authority persuasive. (See 3 Singer, Statutes and Statutory Construction (6th ed. 2001) § 57:6, p. 30 ["The manner in which similar statutes in other states have been construed may be an element bearing upon this question"].) Unlike the majority, but in accordance with our sister states, I would hold that our termination-of-rights statute can be waived in the limited circumstance of a second parent adoption. Just as it has not been necessary to declare similar

---

[1] I adopt the majority opinion's definition of "second parent adoption" (maj. opn., *ante*, at p. 422, fn. 2) and, like the majority, distinguish such adoptions from stepparent adoptions. (See Fam. Code, §§ 8548, 9000–9007.)

[2] Indeed, the New York Court of Appeals' construction of a similar termination-of-rights statute as "mandatory in all cases" was superseded only by subsequent legislation. (*Matter of Jacob, supra,* 660 N.E.2d at p. 404.)

provisions to be directory to affirm second parent adoptions in other states, it is not necessary to make new law to uphold second parent adoptions in California.

I cannot fathom why the majority has deliberately chosen a rationale that is unnecessary to the disposition of this case *and* that has been avoided by other jurisdictions, but I do understand and fear the effect of the majority's additional holding: to put at risk fundamental understandings of family and parentage. Tomorrow, the question may be: *How many legal parents may a child have in California?* And the answer, according to the majority opinion, will be: *As many parents as a single family court judge, in the exercise of the broadest discretion in our law, deems to be in the child's best interest.*

As stated, I do concur in the judgment. But for the reasons that follow, I will not join the majority opinion.

# I

If it is true that you can't get where you're going if you don't know where you've been, then it should come as no surprise the majority finds itself in uncharted territory. The majority claims (without any citation) that "[e]stablished" (maj. opn., *ante*, at p. 436.) administrative interpretation and practice by the California Department of Social Services (CDSS) supports its affirmance of second parent adoptions. It is quite simple, as detailed below, to verify CDSS's interpretation and practice during the relevant period. Unless "established" is redefined to mean "very recent," the historical claim made by the majority cannot be defended.

The first petitions for second parent adoptions were filed in the early 1980's. Between that time and 1999, with only a brief exception, CDSS maintained a policy of opposing "any petition for adoption in which a child is to be adopted into an unmarried couple." (Doskow, *The Second Parent Trap: Parenting for Same-Sex Couples in a Brave New World* (1999) 20 J. Juv. L. 1, 7.) The lone exception to this policy lasted "only a few months" and was promptly reversed when "then-Governor Pete Wilson became aware of the change and ordered [CDSS] to return to its original policy." (*Id.* at p. 7 & fn. 31, citing CDSS, All County Letter No. 95-13 (Mar. 11, 1995), rescinding CDSS, All County Letter No. 94-104 (Dec. 5, 1994).) The original policy then continued in force until November 15, 1999. (Doskow, *supra*, 20 J. Juv. L. at p. 8; see CDSS, All County Letter No. 99-100 (Nov. 15, 1999).) Thus, contrary to the assertion in the majority opinion, CDSS had an established and long-standing administrative interpretation and practice of *opposing* second parent adoptions—based on its interpretation of section 8617—that lasted for well over a decade. (Doskow, *supra*, 20 J. Juv. L. at pp. 12–13;

see also Notice of Proposed Changes in Regulations of the CDSS, Cal. Reg. Notice Register 96, No. 29, p. 446 [proposing adoption of Cal. Code Regs., tit. 22, § 35124].) Moreover, that policy remained in effect until the year before this litigation commenced. Accordingly, any claim that CDSS policy has "for some time" (maj. opn., *ante*, at p. 440) supported second parent adoption is demonstrably incorrect.

Even if the new CDSS policy had not been of such recent vintage, the majority ought to have steered clear of substantial reliance on it. The majority correctly recites that deference to administrative interpretation "is 'situational' and depends on 'a complex of factors.' " (Maj. opn., *ante*, at p. 436, quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [8 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp.*).) But the majority then fails to apply those factors. Where an agency (like CDSS) is merely construing a controlling statute, the weight of the agency's interpretation " 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (*Yamaha Corp.*, *supra*, 19 Cal.4th at pp. 14–15, italics omitted, quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161].)

Analysis of the appropriate factors here would counsel caution, not a kowtow to the agency's recent change in policy. CDSS's consideration of the applicable statutes was hardly *thorough*: the All County Letter announcing the policy reversal is less than one page long and nowhere indicates it was issued in accordance with the Administrative Procedure Act. (*Yamaha Corp.*, *supra*, 19 Cal.4th at p. 13.) The *validity* of CDSS's reasoning is impossible to evaluate: the All County Letter simply announces a reversal in policy, without providing any supporting reasons, and rejects the prior long-standing policy based solely on the fact that it was "an underground regulation inconsistent with the Administrative Procedure Act." (CDSS, All County Letter No. 99-100, *supra*.) This indicates merely that the prior rule was promulgated in an impermissible manner, not that it misinterpreted the statute. (E.g., *Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217 [81 Cal.Rptr.2d 406] [" 'underground' regulations" are "rules which only the government knows about"].) The new CDSS policy plainly is not *consistent*: the All County Letter abandons long-standing policy and had been in effect less than 12 months prior to the institution of this action. (Cf. *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 801 [85 Cal.Rptr.2d 844, 978 P.2d 2] [agency's interpretation of statute for "almost 20 years" is " ' "long-standing" ' "].) Nor is CDSS's policy reversal reasonably contemporaneous with the adoption of the relevant statutes. (*Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1118, fn. 4 [95 Cal.Rptr.2d 514, 997 P.2d 1169].)

In short, *none* of these factors supports the majority's conclusion that the 1999 policy reversal "would appear to be entitled to great weight" and merits "substantial deference." (Maj. opn., *ante*, at p. 436.) Accordingly, I would not make such a claim. The significance of the 1999 policy reversal, in my view, is that we are no longer bound to defer to CDSS's established and long-standing policy of *disapproving* second parent adoptions. (*Yamaha Corp.*, *supra*, 19 Cal.4th at p. 13 [" '[a] vacillating position . . . is entitled to no deference' "].) We need not (and ought not) torture settled administrative law to go further than that.

## II

As stated above, I conclude that in the limited circumstance of a second parent adoption, the parties may waive section 8617's requirement that the parental rights of the birth parent be terminated. Unlike the majority, however, I do not rest my conclusion that section 8617 can be waived in this limited circumstance on the theory that it is merely directory.

The designation of a statute as either mandatory or directory must be made with reference to the statute's purpose. (*People v. McGee* (1977) 19 Cal.3d 948, 962 [140 Cal.Rptr. 657, 568 P.2d 382].) Designating section 8617 as nonmandatory or directory means that the termination of parental rights at the time of adoption is " 'immaterial' " and involves only a matter of " 'convenience.' " (*Francis v. Superior Court* (1935) 3 Cal.2d 19, 28 [43 P.2d 300].) Designating section 8617 as directory also means that it may be waived at the will of the parties. (*In re Johnson* (1893) 98 Cal. 531, 539 [33 P. 460].) This, of course, is the view advanced by the majority, which states that the termination of parental rights in section 8617 is not " 'for a public purpose' " but instead is "for the benefit of the parties to an adoption petition" and thus is "waivable by the parties thereto." (Maj. opn., *ante*, at p. 427.) This analysis is contrary to our precedents, contrary to legislative policy, and has predictably unfortunate consequences.

Now that section 8617 has been classified as directory, the parties to every type of adoption are free to disclaim its effect whenever they choose. Any number of consenting adults may thus agree to adopt the same child, so long as a single family court judge finds the adoption is in the child's interest. (See maj. opn., *ante*, at p. 446.) Nothing in the Family Code would be left to prevent a child from having three or four or a village's worth of legal parents, so long as all the would-be parents agree to waive section 8617 and a sole family court judge sometime, somewhere, finds the adoption to be in the child's interest. (*In re Johnson*, *supra*, 98 Cal. at p. 539 [a directory provision "is to be complied with or not in the discretion of the judge"].) Inasmuch as there is "[n]o higher discretion" than that vested in a trial court resolving a

petition of adoption (*In re Adoption of Bewley* (1914) 167 Cal. 8, 10 [138 P. 689]), the majority all but guarantees new and even bizarre family structures.

The majority discounts this possibility as "[n]onsense," claiming that "[w]hile CDSS has for some time treated section 8617 as waivable, such scenarios have not materialized." (Maj. opn., *ante*, at p. 440.) I do not find this comforting. Nothing in CDSS policy states that section 8617 is nonmandatory. Rather, the new CDSS policy, like this separate opinion, permits section 8617 to be waived only in the limited circumstance of a second parent adoption. In any event, it is far too soon to gauge the effect of the recent reversal in CDSS policy, which (as Justice Brown points out) postdates the adoption agreement in this case. (Conc. and dis. opn. of Brown, J., *post*, at p. 459, fn. 2.) The regime the majority announces today has not yet been tested here.

However, it does not take much imagination to predict what that regime will look like. Commentators have recognized that a child may end up with any number of parents when family structure becomes a matter of private ordering. (King, *Solomon Revisited: Assigning Parenthood in the Context of Collaborative Reproduction* (1995) 5 UCLA Women's L.J. 329, 388 (King) ["Unlike the nuclear family model, families of consent can include one, two, or more parents"].) The available empirical evidence supports this prediction. An Alaska superior court's finding that a similar termination-of-rights statute was directory was followed quickly by an adoption in which neither natural parent severed ties with the child. "Accordingly, *the child now has three legal parents*." (Patt, *Second Parent Adoption: When Crossing the Marital Barrier Is in a Child's Best Interests* (1987–1988) 3 Berkeley Women's L.J. 96, 132, italics added (Patt).) Moreover, at oral argument, Annette's counsel informed us that superior courts in this state have already allowed a child to have more than two legal parents, apparently based on counsel's theory that section 8617 is merely directory.[3]

---

[3] The majority states that because "[t]his case involves only a second parent adoption," we have no occasion to consider "whether there exists an overriding legislative policy limiting a child to two parents." (Maj. opn., *ante*, at p. 427, fn. 6.) Naturally, I wholeheartedly agree. After all, it is only the *majority's* gratuitous holding that section 8617 is directory—and hence waivable at the election of the parties—that raises concerns about how many parents a child might acquire through the adoption process. The majority's alternate assertion that it does not intend to validate an adoption that "omits any essential statutory element" or "is in violation of a public policy the Legislature may express" (maj. opn., *ante*, at p. 440) is mere wishful thinking—for without section 8617, there *is* no statutory element, essential or otherwise, that protects the child who completes the adoption process from ending up with more than two legal parents. Tellingly, the majority does not even purport to identify one.

Since I am not a legislator, my own views as to whether children should be allowed to have three or more legal parents are not relevant here, although it does appear that such arrangements are highly problematic. (See Shapo, *Matters of Life and Death: Inheritance Consequences of Reproductive Technologies* (1997) 25 Hofstra L.Rev. 1091, 1199 ["The facts of *Michael H.* [*v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333] highlight the practical difficulties of a divided authority and a disrupted family unit that may result from more than two legal parents"].) The existence of multiple parents would also make more difficult the resolution of disputes that may arise over custody and visitation, as well as conflicts over other parental rights and responsibilities. (Cf. maj. opn., *ante*, at p. 424.) In any event, the important point—and the one the majority deliberately ignores—is that "[e]xisting law recognizes a maximum of two parents per child." (King, *supra*, 5 UCLA Women's L.J. at p. 386.) Indeed, no commentator of whom I am aware shares the majority's agnosticism as to "whether there exists an overriding legislative policy limiting a child to two parents." (Maj. opn., *ante*, at p. 427, fn. 6; cf. Liebler, *Are You My Parent? Are You My Child? The Role of Genetics and Race in Defining Relationships After Reproductive Technological Mistakes* (2002) 5 DePaul J. Health Care L. 15, 53 ["I suggest that the statutory requirements that children can have only two parents be changed"]; Sheldon, *Surrogate Mothers, Gestational Carriers, and a Pragmatic Adaptation of the Uniform Parentage Act of 2000* (2001) 53 Me. L.Rev. 523, 573, fn. 226 ["innumerable state and federal statutes . . . are premised on a maximum of two parents"]; Katz, *Ghost Mothers: Human Egg Donation and the Legacy of the Past* (1994) 57 Albany L.Rev. 733, 755 ["The premises underlying the legal definitions of parent and nonparent have been that a child should have no more than two legal parents"]; see also *Michael H. v. Gerald D., supra*, 491 U.S. at p. 118 (plur. opn. of Scalia, J.) ["California law, like nature itself, makes no provision for dual fatherhood"].) Moreover, numerous provisions of the Family Code—including the sections cited by the majority—demonstrate the Legislature intended to limit a child to no more than two legal parents. In fact, this intent is made manifest in section 8617 itself, which terminates the birth parents' rights "from the time of the adoption." Since a child can have no more than two birth parents (see Fam. Code, § 8512; *id.*, § 7613, subd. (b); see also *Johnson v. Calvert* (1993) 5 Cal.4th 84, 92, fn. 8 [19 Cal.Rptr.2d 494, 851 P.2d 776]), section 8617 ensures that the child does not acquire more than two through the process of adoption. The majority's unique unwillingness to acknowledge section 8617's role in limiting a child to no more than two parents defies common sense.[4]

---

[4] In its truncated discussion of section 8617's purpose, the majority seems to operate under the impression that a statute's public purpose must be ascertained by considering the provision *in isolation*. If so, the majority is again mistaken. (*Francis v. Superior Court, supra*, 3 Cal.2d at p. 28 ["Another rule equally well recognized in the construction of such a statute is that whether a statute is mandatory or directory depends upon the legislative intent as ascertained

The majority's contention that section 8617 "does not speak to parental numerosity" (maj. opn., *ante*, at p. 427, fn. 6) is not only very hard to understand, but is also flatly contrary to our precedents. In *Estate of Jobson* (1912) 164 Cal. 312 [128 P. 938], we construed the predecessor to section 8617 in a situation where the biological father sought a partial distribution of his decedent son's estate. The decedent, however, had been adopted by his maternal grandparents years before. In rejecting the biological father's claim, we explained the operation of the statute: "These various rulings seem to establish the doctrine that the effect of an adoption under our Civil Code is to establish the legal relation of parent and child, with all the incidents and consequences of that relation, between the adopting parent and the adopted child. This *necessarily* implies that the natural relationship between the child and its parents by blood is superseded . . . . Once we have reached the conclusion that the effect of an adoption under the code is to substitute the adopting parent for the parent by blood, we must give to that conclusion its logical results. From the time of the adoption, the adopting parent is, so far as concerns all legal rights and duties flowing from the relation of parent and child, the parent of the adopted child. From the same moment, the parent by blood ceases to be, in a legal sense, the parent. *His place has been taken by the adopting parent.*" (*Estate of Jobson, supra,* 164 Cal. at pp. 316–317, italics added.)

I read *Estate of Jobson* as confirming the pivotal role of section 8617's predecessor in limiting the number of legal parents a child may acquire through an adoption. And I do not think mine is an idiosyncratic reading. Commentators—even those quoted by the majority itself—have recognized that section 8617 "protects the child from the burden of owing duties and obligations to two families." (Patt, *supra,* 3 Berkeley Women's L.J. at p. 117.) Thus, by gratuitously holding that section 8617 is nonmandatory, the majority guts that protection, to the detriment of children generally.

The majority claims to agree that courts should leave innovation in adoption policy to the Legislature. (Maj. opn., *ante,* at p. 443.) But the claim rings hollow here—since by classifying section 8617 as directory, this court has usurped the Legislature's power to limit a child to no more than two parents and has bestowed it instead on an individual family court judge, who may assign a child as many legal parents as the lone judge deems in the child's best interest. In my view, that is a breathtaking innovation in adoption policy. A change of this scope should be decided only by the Legislature or

from the consideration of the whole act"]; *Cole v. Antelope Valley Union High School Dist.* (1996) 47 Cal.App.4th 1505, 1513 [55 Cal.Rptr.2d 443] ["considering the purpose and provisions of the statutory scheme as a whole"].) Indeed, since at least *In re Johnson, supra,* 98 Cal. at page 536, we have found it "necessary" to read the statute in question "with other sections of the same code relating to the subject of adoption" to determine whether the statute was mandatory or directory.

the people by initiative. (*Williams v. North Carolina* (1942) 317 U.S. 287, 303 [87 L.Ed. 279, 63 S.Ct. 207].)

## III

To the extent the majority believes itself compelled to classify section 8617 as directory in order to authorize second parent adoptions in California, it is mistaken. Our case law—including the same case law the majority purports to apply—would allow the parties to an adoption to waive the effect of section 8617, as long as the waiver did not seriously compromise the provision's public purpose. Second parent adoptions, by definition, pose no threat to the legislative policy limiting a child to no more than two legal parents. Hence, under our existing case law, it is enough to say that section 8617 does not bar second parent adoptions generally or this proposed adoption in particular.

We begin with our rules for construing the Family Code. Although the law of adoption is "wholly statutory" (*Estate of Sharon* (1918) 179 Cal. 447, 454 [177 P. 283]), "[t]he rule is that the adoption statutes are to be liberally construed with a view to effect their objects and to promote justice. Such a construction should be given as will sustain, rather than defeat, the object they have in view." (*Department of Social Welfare v. Superior Court* (1969) 1 Cal.3d 1, 6 [81 Cal.Rptr. 345, 459 P.2d 897].) " 'The main purpose of adoption statutes is the promotion of the welfare of children . . . by the legal recognition and regulation of the consummation of the closest conceivable counterpart of the relationship of parent and child.' " (*Adoption of Barnett* (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18].)

A second parent adoption promotes the welfare of children by formalizing in law a relationship that already exists in fact between the child and the prospective parent. Moreover, it does so without compromising the public purpose, set forth in section 8617, of limiting a child to no more than two parents. Therefore, in this limited circumstance, the parties should be permitted to waive the requirements of section 8617 and avoid the termination of the birth parent's rights.

There is ample precedent for permitting a limited waiver of statutes that serve important public purposes. After all, this is the analytical model we employed in *Cowan v. Superior Court* (1996) 14 Cal.4th 367 [58 Cal.Rptr.2d 458, 926 P.2d 438] (*Cowan*). This is also the analysis we approved in *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040 [68 Cal.Rptr.2d 758, 946 P.2d 427] (*Bickel*). And this is the analysis we invoked most recently *County of Riverside v. Superior Court* (2002) 27 Cal.4th 793 [118 Cal.Rptr.2d 167, 42 P.3d 1034] (*County of Riverside*). *None* of these cases even uttered the words "mandatory" or "directory."

In *Cowan*, we held that a criminal defendant under certain circumstances may waive the benefit of a statute of limitations to a lesser offense than that charged, even though the statute existed partly to achieve certain public benefits. (*Cowan, supra,* 14 Cal.4th at pp. 374–375; *Bickel, supra,* 16 Cal.4th at p. 1050.) We described the operative waiver as one that is knowing, intelligent, and voluntary; is made for the defendant's benefit after consultation with counsel; and does not handicap the defense " ' "or contravene any other public policy reasons motivating the enactment of the statutes." ' " (*Cowan, supra,* 14 Cal.4th at p. 372.)

Similarly, in *Bickel*, we observed that developers could waive the benefits of the Permit Streamlining Act "if the administrative record shows that the applicant has made a knowing, intelligent, and voluntary waiver in circumstances where the applicant might reasonably anticipate some benefit or advantage from the waiver, and if the waiver does not seriously compromise any public purpose that the Act's time limits were intended to serve." (*Bickel, supra,* 16 Cal.4th at p. 1050.)

Finally, in *County of Riverside*, we upheld a limited waiver by a probationary deputy sheriff of the Public Safety Officers Procedural Bill of Rights Act —which is yet another law " 'established for a public reason.' " (*County of Riverside, supra,* 27 Cal.4th at p. 804.) This waiver, once again, was limited to the circumstance where "enforcement of the waiver would not particularly undermine the public purpose of the Act." (*Id.* at p. 806.)

Unlike the majority, I would find it sufficient to apply *Cowan, Bickel,* and *County of Riverside* here and permit the parties to a second parent adoption to knowingly, intelligently, and voluntarily waive the termination of parental rights otherwise required by section 8617, inasmuch as the waiver would not contravene, compromise, or undermine the statute's public purpose. (Cf. *Cal-Air Conditioning, Inc. v. Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 668–671 [26 Cal.Rptr.2d 703] [strict compliance with mandatory provision is unnecessary where every reasonable objective of the statute has been satisfied].)

Construing section 8617 in this manner is not only consistent with our canons of construction generally, it is also consistent with our precedents in the area of adoption law. In *Marshall v. Marshall* (1925) 196 Cal. 761 [239 P. 36], which nowhere mentions the terms "directory" or "mandatory," we permitted the parties to waive the predecessor to Family Code section 8617 in an analogous circumstance. We held that a stepfather's adoption of his wife's children did not terminate her parental relationship with the children, notwithstanding the provisions of Civil Code former section 229, on the ground that the parties to that adoption "did not intend thereby to sever the parental

relationship between the mother and the children." (*Marshall, supra,* at p. 766.) But, rather than make the provision waivable in all circumstances, we merely recognized a limited waiver to permit "a husband and wife . . . [to] jointly adopt a child pursuant to the procedure therein prescribed, the result of which is to make the child, in law, the child of both spouses." (*Id.* at p. 767.) Had *Marshall* intended to make the provision directory, it would not have been necessary to limit our holding, as we did repeatedly, to "the circumstances of this case" (*id.* at p. 766) and "a situation such as this" (*id.* at p. 767).

In my view, *Marshall*'s construction of Civil Code former section 229 was grounded on the circumstance that the stepparent adoption did not contravene, compromise, or undermine that provision's public purpose, which we had discussed previously in *Estate of Jobson, supra,* 164 Cal. 312. *Marshall* thus supports the validity of second parent adoptions involving unmarried persons, which similarly do not undermine section 8617's public purpose. A fair reading of *Marshall* refutes the notion that we have ever deemed Civil Code former section 229—or its successor—to be directory.

## IV

The majority's remaining justifications for classifying section 8617 as directory are similarly without merit.

The majority appears to reason that because section 8617 is not jurisdictional, it cannot be classified as mandatory. (Maj. opn., *ante,* at pp. 428, 434.) The majority has made a common mistake. "A typical misuse of the term 'jurisdictional' is to treat it as synonymous with 'mandatory.' " (2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 4, pp. 548–549.) "But for the Legislature to declare that a section is mandatory does not necessarily mean that a failure to comply with its provisions causes a loss of jurisdiction to make any decision whatever." (*Liberty Mut. Ins. Co. v. Ind. Acc. Com.* (1964) 231 Cal.App.2d 501, 509 [42 Cal.Rptr. 58].) Hence, the fact that section 8617 is not jurisdictional does not shed light on whether it is nonetheless mandatory. (*County of Santa Clara v. Superior Court* (1971) 4 Cal.3d 545, 551, fn. 2 [94 Cal.Rptr. 158, 483 P.2d 774].)

Likewise, it is irrelevant that compliance with section 8617 is not an "essential element[] of every valid adoption." (Maj. opn., *ante,* at p. 428.) Section 8617, of course, is not even intended to apply to *every* valid adoption. For example, section 8617 would not apply where the birth parents are deceased or have otherwise had their rights terminated, and does not apply at all in agency adoptions. (See Fam. Code, § 8700 et seq.) That section 8617 does not apply in some circumstances, though, has no bearing on whether it

is mandatory in the circumstances in which it does apply. Not surprisingly, the majority offers no authority to the contrary.

The majority also lacks support for its artificial distinction between a "mandatory prerequisite" to an adoption (maj. opn., *ante*, at p. 427) and a "legal consequence." (*Id.* at p. 427.) In particular, nothing in *In re Johnson*, which addressed the validity of an adoption where the minor child was not examined by the judge under Civil Code former section 227, supports the claim that the adoption laws "always have made a fundamental distinction between the ordinary legal consequences of an adoption and 'what provisions of the law are essential and therefore mandatory.' " (Maj. opn., *ante*, at p. 428, quoting *In re Johnson*, *supra*, 98 Cal. at p. 536.) Consequences, like prerequisites, can be mandatory. (E.g., *West Shield Investigations & Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935, 949 [98 Cal.Rptr.2d 612] [mandatory consequences of court-ordered emancipation].) In fact, much of law involves attaching mandatory consequences to a particular constellation of facts. That section 8617 may describe a consequence rather than an element of an adoption thus has no bearing on whether it is mandatory.

In sum, nothing in law or policy justifies the majority's evisceration of the important public purpose underlying section 8617—namely, the legislative declaration and case authority that a child needs no more than two legal parents.

## V

Second parent adoptions by unmarried persons are consistent with California law. I would apply that settled law to decide this case. It is disappointing that, in reaching the same result, the majority has instead upset fundamental legislative policy concerning family structure, substantially altered administrative law concerning deference to executive agencies, and rendered unrecognizable our own case law concerning the distinction between statutory provisions that are mandatory and those that are directory. I can therefore join only in the judgment.

Chin, J., concurred.

**BROWN, J.,** Concurring and Dissenting.—This case raises questions concerning the past, present and future of California adoption law. Regarding the past, I agree that we should not disturb settled familial relationships. Regarding the present, Annette F. may deserve partial custody based on estoppel. The most important question, however, is whether the California Department of Social Services ought to continue authorizing these second parent

adoptions in the thousands of cases that will arise in the future. The Legislature has heretofore required a legal relationship between the birth and second parent, and I would defer to this rule and bar second parent adoptions that violate the statutory scheme.

## I. THE LEGISLATURE HAS PRECLUDED SECOND PARENT ADOPTIONS EXCEPT IN LIMITED CIRCUMSTANCES

This case turns on whether we deem Family Code section 8617[1] directory or mandatory. The statute provides "[t]he birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child." (*Ibid.*) As a general rule, adoption extinguishes the rights of the natural parents forever, although stepparenthood provides a "narrow exception[]" to this rule. (*Estate of Cleveland* (1993) 17 Cal.App.4th 1700, 1707, fn. 8 [22 Cal.Rptr.2d 590].) This norm reflects the imperative that there should not be any ambiguity about who is a child's "real" parent. "[T]he effect of an adoption . . . is to establish the legal relation of parent and child, with all the incidents and consequences of that relation, between the adopting parent and the adopted child. This necessarily implies that the natural relationship between the child and its parents by blood is superseded. *The duties of a child cannot be owed to two fathers at the same time.*" (*Estate of Jobson* (1912) 164 Cal. 312, 316–317 [128 P. 938], italics added (*Jobson*).) The majority asserts the Legislature has merely described, rather than prescribed, this transfer of parental authority and responsibility, which is thus merely one option for the birth and adopting parents involved. Twice in the past decade, however, the Legislature has indicated otherwise.

The logical starting point for construing section 8617 is section 9306, which concerns the adoption of an adult ("person") rather than a child. The text is nearly identical: "[T]he birth parents of a person adopted . . . are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted person, and have no right over the adopted person." (§ 9306, subd. (a).) In 1993, the Legislature added subdivision (b) to section 9306, which provides, "Where an adult is adopted by the spouse of a birth parent, the parental rights and responsibilities of that birth parent are not affected by the adoption." (Stats. 1993, ch. 266, § 2.) If, as the majority claims, there is no statutory restriction on second parent adoptions, subdivision (b) is superfluous.

But the Legislature perceived no superfluity. On the contrary, "[t]he purpose of this bill is [to] create an exception to the automatic severance of

---

[1] Hereafter, all statutory references are to the Family Code unless otherwise indicated.

parent-child relationships." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 970 (1993–1994 Reg. Sess.) May 18, 1993, p. 2.) The Senate Judiciary Committee's analysis quoted section 8548 in observing "existing law" provided that a birth parent retains custody and control when a stepparent adopts a *child.* (See § 8548 [" 'Stepparent adoption' means the adoption of a child by a stepparent where one birth parent retains custody and control of the child"].) Thus, no special subdivision (b) was needed for section 8617 because section 8548 served that purpose. There was no counterpart to section 8548 to provide for second parent adoptions of *adults*; section 9306, subdivision (b), therefore conformed the law for these circumstances. "It is unclear why such distinctions were drawn between a stepparent adoption of minors and a stepparent adoption of adult children of spouses but the distinctions seem unnecessary and outmoded." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 970 (1993–1994 Reg. Sess.) May 18, 1993, p. 3.) The amendment to section 9306 indicates stepparenthood was the only context in which the ordinary transfer of duties and rights from birth parent(s) to adoptive parent(s) did not occur.

The Legislature confirmed its understanding that second parent adoptions were not a universal option when it allowed registered domestic partners to participate in this procedure. As the Senate Rules Committee's analysis explained, "This bill expands California law on domestic partnerships by . . . conferring on domestic partners various rights, privileges and standing conferred by the State on married couples . . . . [¶] . . . [¶] [including] [t]he right of a domestic partner to adopt a child of his or her partner as a stepparent." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 25 (2001–2002 Reg. Sess.) as amended Sept. 7, 2001, pp. 1–2.) Section 9000, subdivision (f), now provides that "[f]or the purposes of this chapter, stepparent adoption includes adoption by a domestic partner."

Against these two expressions of legislative limits on second parent adoption, the majority offers a six-sentence "letter" issued by the California Department of Social Services on November 15, 1999 (the Letter), abolishing any marital requirements for second parent adoption. (See maj. opn., *ante*, at p. 423, fn. 3.) The letter purports to invalidate prior letters expressing a different policy,[2] which it characterized as "an underground regulation inconsistent with the Administrative Procedure Act"—an apt description for the Letter itself. The Administrative Procedure Act (hereafter APA; Gov. Code, § 11346 et. seq.) "establish[es] basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations." (*Ibid.*) The APA requires the government agency offering the regulation to provide, inter alia, a copy of the proposed regulation; a statement of reasons

---

[2] Even assuming the Letter validly described the law, the contrary rule was thus in place in August 1999, when Sharon and Annette signed the adoption agreement for Joshua.

for the adoption, amendment, or repeal of a regulation; identification of every study justifying the change; a description of alternatives to the proposal; and the agency's reasons for rejecting those alternatives. (Gov. Code, § 11346.2.) The APA also provides for public input through either a public hearing or written comments. (Gov. Code, § 11346.8.) Because the California Department of Social Services failed to observe these procedures, the Letter did not comply with the statutory requirements, and is thus as much an underground regulation as any former rule.

The Letter fails in substance as well as procedure. Government Code section 11349, subdivision (a), requires a " '[n]ecessity' " for the rule, "to effectuate the purpose of [a] statute, court decision, or other provision of law that the regulation implements, interprets, or makes specific . . . ." Subdivision (e) requires " '[r]eference' " to the statute, court decision, or other legal provision. The Letter provides neither of these. Furthermore, the regulation must "be[] in harmony with, and not in conflict with" existing law. (*Id.*, § 11349, subd. (d).) Since, as noted, the Legislature has provided only narrow exceptions to Family Code section 8617, the Letter arguably conflicts with the law as it then existed. Nevertheless, the lesson of the majority opinion is that administrative agencies need not follow the dictates of the Legislature or this court, we will follow them. The California Department of Social Services' violation of the statutory law thus serves as its retroactive justification.

## II. NEITHER *MARSHALL* NOR WAIVER PRINCIPLES SUPPORT PROSPECTIVE VALIDATION OF SECOND PARENT ADOPTIONS OUTSIDE THE STATUTORY SCHEME

Against the expressed intent of the Legislature, the majority abrogates any *status-based requirements* for second parent adoptions, relying on our decision in *Marshall v. Marshall* (1925) 196 Cal. 761 [239 P. 36] (*Marshall*) and the principle that parties may waive rules imposed primarily for their benefit. Neither justification supports the majority's conclusion.

### A. *Marshall*

The court in *Marshall* retroactively authorized a second parent adoption by the new husband of a widow and held that "a *husband* and *wife* may jointly adopt a child . . . the result of which is to make the child, in law, the child of both *spouses*." (*Marshall, supra,* 196 Cal. at p. 767, italics added.) The majority both disregards the context and finds the italicized language immaterial, concluding instead that the opinion authorizes adoption by any couple wishing to adopt, regardless of marital status. This reads contemporary norms into a 1925 decision, when the prevailing precedents deemed marriage "the

most important relation in life, and one in which the state is vitally interested . . . . The well-recognized public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together, and to prevent separation and illicit unions." (*Deyoe v. Superior Court* (1903) 140 Cal. 476, 482 [74 P. 28].)

Moreover, the Legislature subsequently enacted former section 226 of the Civil Code, which contained four separate references to "an adoption *by a step-parent* where one natural parent retains his or her custody and control of the child." (Italics added.) Had the Legislature deemed stepparenthood immaterial, it would not have specifically included the italicized language. Accordingly, even if the *Marshall* court had been indifferent to the existence of a marital commitment, the Legislature was not. The Legislature has since added an entire chapter of statutes expressly regulating stepparent adoptions. (Fam. Code, § 9000 et seq.) These provisions reflect the Legislature's understanding that it was creating a special procedure for adoption and an exception to the general rule set forth in Family Code section 8617. Section 9000, subdivision (f), confirms this understanding.

The Legislature also recently extended to registered domestic partners the opportunity to follow the stepparent adoption procedure. Unlike the pre-*Marshall* legal landscape, where there was no statutory authorization for a child to live with a birth parent and a second parent, the law currently provides that opportunity to all couples who comply with the statutory prerequisites by formalizing their relationship.

Thus, even if the *Marshall* court lacked any legislative guidance, we do not. The Legislature has twice prescribed the terms by which a child may gain a second parent without losing the first: only where the two parents are related by marriage or domestic partnership. This court has no authority to reject the legislative rule for one it deems preferable.

At most, *Marshall* supports Annette's claim; as we vindicated the intent and expectations of the Marshalls, perhaps so too should we vindicate the (original) intent and expectations of Sharon S. and Annette. But retroactive authorization of the adoption in *Marshall* did not create a prospective rule that any second parent adoption would be valid. Even if it had, subsequent legislation established that this option is available only to those couples who marry or form a domestic partnership, nullifying any contrary expectation or assumption. The majority may have justification for applying equitable principles to preserve a family attachment already created, but it has no basis for prospectively abrogating a legislative scheme that has stood for more than 70 years.

## B. *Waiver*

The majority also asserts that the section 8617 transfer of authority from birth parent to adoptive parents is optional, because it amounts to a benefit for the parents themselves. But section 8617 is but one of many rules governing adoption that exist to effect not the preferences of the adults but the welfare of the child, and thus society itself. The majority's reconstruction of section 8617 ignores this imperative.

In addressing the questions of whether the statute is designed to benefit the parties or the public, the majority construes the provision as a primarily private benefit to the parents only through a selective citation of the text. Perhaps birth parents often wish to be " 'relieved of all . . . duties towards, and all responsibility for, the adopted child.' " (Maj. opn., *ante*, at p. 429, quoting § 8617.) After all, many people may wish to limit their duties and responsibilities. But this disregards the second part of the statute, which deprives the birth parent of any "right over the child." (§ 8617.) A rule that strips both duties and rights from one party is not primarily intended to benefit that party.

Nor is the argument that the law is primarily designed for the benefit of the birth *and* adoptive parents any stronger, for it suffers from the same defect. The law both deprives the birth parents of their rights and imposes duties and responsibilities on the adoptive parents. In terms of the legal position of the parties, therefore, they swap places in a zero-sum game. There would be no point for the Legislature to specify terms if the adoption were nothing more than a mutually self-interested contract between two adults or couples.

But it is not. "The agreement is *for the benefit of the child*, not of the parents or persons making it." (*Estate of Grace* (1948) 88 Cal.App.2d 956, 966 [200 P.2d 189]; see also *Adoption of Barnett* (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18] [" 'The main purpose of adoption statutes is the promotion of the welfare of children' "].) We have explained how a complete transfer of duties and rights is necessary to prevent the confusing position of multiple lines of parental authority. We thus announced the general imperative (from which the *Marshall* court and then the Legislature carved exceptions) that "[f]rom the time of adoption, the adopting parent is, so far as concerns all legal rights and duties flowing from the relation of parent and child, the parent of the adopted child. From the same moment, the parent by blood ceases to be, in a legal sense, the parent." (*Jobson, supra,* 164 Cal. at p. 317.)

This rule prevents the child from being burdened with a conflict between the birth parent(s) and adoptive parents(s). If the agreement were simply a

means for the birth and adopting parents to effect their private preferences, the law could authorize all permutations of divided rights and duties. The Legislature has concluded otherwise, insisting on an unambiguous transfer of authority unless the birth parent and adopting parent have formally joined together to forge a common future.

## III. THE MAJORITY TRIVIALIZES FAMILY BONDS

The majority's reliance on a mutual waiver imports the principles of the marketplace into the realm of home and family, which was once thought to represent a "haven in a heartless world" of self-interested interactions. (Lasch, Haven in a Heartless World (1977).) The family is the area where people act not in accordance with specifically contracted agreements but the duties of the heart. Parents are not simply self-interested utility maximizers. Raising a child is, like hope, a task of the spirit. It is so much more than an aggregation of services.

Parenthood instead is the opportunity and responsibility to join the web of human connectedness through which we touch the past, the present, and the future. The relationship of parent and child is the most fundamental bond humans share and the influence of family in determining what kind of people we become is profound. Society has a considerable stake in the health and stability of families, because it is upon the families—what Burke calls "the little platoon—that we rely [on] not only to nurture the young but to provide the seed beds of civic virtue required for citizenship in a self-governing community. [The family teaches us to] care for others, [and] to moderate . . . self-interest . . . ." (Berns, The First Amendment and the Future of American Democracy (1976) p. 222.) All tasks which will be hampered if the family is simply "a collection of individuals united temporarily for their mutual convenience and armed with rights against each other." (Schneider, *Moral Discourse and the Transformation of American Family Law* (1985) 83 Mich. L.Rev. 1803, 1859.) The "arduous, long-term educational process [of raising a child] requires not a spirit of contractualist autonomy, but a spirit of adult commitment and . . . sacrifice." (Hafen, *Individualism and Autonomy in Family Law: The Waning of Belonging* (1991) 1991 BYU L.Rev. 1, 30.)

The majority, irretrievably committed to its the-more-parents-the-merrier view of parenthood, declines to interpret section 8617 to effectively preclude a child from having more than two parents; and at oral argument Annette's counsel asserted no such limit should exist. Such a position is consistent with the stunted view of parenthood as purely ministerial and economic—signing consent slips and providing health insurance. But this is the least part of being a parent, as anyone who has ever seen a newborn resting securely in her father's hand can understand; and anyone who has sat up late at night

awaiting the safe return of a newly minted teenage driver knows. The all–encompassing nature of parenthood renders eminently reasonable any legislative provision requiring that adopting parents share a common residence with each other and the adopted child. (See Fam. Code, § 297, subd. (b)(1).) Parenthood requires more than a telephone and a checkbook.

The United States Supreme Court has found parental authority constitutes a zero-sum game. (*Michael H. v. Gerald D.* (1989) 491 U.S. 110, 118 [105 L.Ed.2d 91, 109 S.Ct. 2333].) Parental authority cannot not be divided because it goes beyond ministerial functions; the parent " 'direct[s] the child's activities; . . . make[s] decisions regarding the control, education, and health of the child; . . . [and exercises] the duty, to prepare the child for additional obligations, which includes the teaching of moral standards, religious beliefs, and elements of good citizenship.' " (*Id.* at p. 119, quoting 4 Cal. Fam. Law (1987) § 60.-02[1][b], fns. omitted.) Devolving these responsibilities on a multitude of parties would lead to a variety of conflicts and inconsistencies, as Justice Baxter correctly notes. (See conc. & dis. opn. of Baxter, J., *ante*, at p. 453.)

The two-person limit is one point on which proponents of Proposition 22 and Assembly Bill No. 25 (2001–2002 Reg. Sess.) agree. The Legislature's insistence that the adopting parent have a legal relationship with the birth parent reflects the fact that the adoptive parent's relationship with the child does not exist in a vacuum but is related to the parents' relationship with each other. Justice Thurgood Marshall wrote for a unanimous Supreme Court in holding it was proper to distinguish between formerly married and never-married fathers in granting only the former the right to veto an adoption by the mother's new husband. (*Quilloin v. Walcott* (1978) 434 U.S. 246, 256 [54 L.Ed.2d 511, 98 S.Ct. 549].) "[T]he State was not foreclosed from recognizing this difference in the extent of [the] commitment to the welfare of the child." (*Ibid.*) This "commitment enables the courts, as well as those most personally involved, to make certain assumptions—even knowing they will at times be disappointed—about what to expect." (Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy: Balancing the Individual and Social Interests* (1983) 81 Mich. L.Rev. 463, 499.)

The law permits single individuals to adopt a child on their own because one parent is better than none. It does not follow, however, that two unrelated parents are better than one. The majority cites the legislative policy that " 'adoption or guardianship is more suitable to a child's well-being than is foster care' " (maj. opn., *ante*, at p. 438, fn. 16, quoting Welf. & Inst. Code, § 396), as adoption is a more permanent relationship than foster care. However, if the birth parent has a relationship with a second parent, and then a third, and then a fourth, the child may be worse off than if the birth parent

had simply raised the child alone. The choice in second parent adoption cases is not between adoption and foster care. The birth parent in such circumstances is willing and able to continue expressing parental responsibility. If the two adults are uncertain whether the second parent will be a permanent resident of the household, the adoption ought to wait until they are ready for that commitment.

There is a long-standing tension within the law as to whether legal standards should reflect ideal behavior or simply the mean.[3] The majority, however, refuses to impose even a standard of the mean. Couples who raise children together do predominantly have a formal legal relationship with each other. It is not a standard that individuals cannot reach absent heroism, and every Californian adult has access to such a relationship. Today's decision maximizes the self-interest and personal convenience of parents, but poorly serves the state's children who deserve as much stability and security as legal process can provide.

Petitioner's petition for a rehearing was denied October 22, 2003. Brown, J., did not participate therein. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

---

[3] " 'All systems of ethics, no matter what their substantive content, can be divided into two main groups. There is the "heroic" ethic, which imposes on men demands of principle to which they are generally *not* able to do justice, except at the high points of their lives, but which serve as signposts pointing the way for man's endless *striving*. Or there is the "ethic of the mean," which is content to accept man's everyday "nature" as setting a maximum for the demands which can be made.' " (Schneider, *Moral Discourse and the Transformation of Family Law*, *supra*, 83 Mich. L.Rev. at p. 1819, quoting letter from Max Weber to Edgar Jaffe (1907).)